452 So.2d 921 (1984)
JOHN F. KENNEDY MEMORIAL HOSPITAL, INC., a Florida Corporation; Gladys Landy, Individually and As the Duly Appointed Guardian of the Person of Francis Landy, Deceased; and Roger Crews, M.D., Appellants,
v.
The Honorable David H. BLUDWORTH, State Attorney, in and for the Fifteenth Judicial Circuit of the State of Florida, Appellee.
No. 63769.
Supreme Court of Florida.
May 24, 1984.
*922 Eric B. Meyers and James C. Cunningham, Jr., Miami, and John R. Day of Shutts & Bowen, West Palm Beach, for petitioner.
David H. Bludworth, State Atty., and Lisa J. Campbell, Asst. State Atty., West Palm Beach, for respondent.
Joel T. Strawn of MacMillan, Newett, Strawn, Stanley & Botos, Delray Beach, for Fla. Hosp. Ass'n, Inc., amicus curiae.
Thomas A. Horkan, Jr., Tallahassee, for amicus curiae.
ALDERMAN, Chief Justice.
We accept jurisdiction to review the decision of the District Court of Appeal, Fourth District, in John F. Kennedy Memorial Hospital, Inc. v. Bludworth, 432 So.2d 611 (Fla. 4th DCA 1983). The district court has certified the following question to us as one of great public importance:
In the case of a comatose and terminally ill individual who has executed a so-called "living" or "mercy" will, is it necessary that a court appointed guardian of his person obtain the approval of a court of competent jurisdiction before terminating extraordinary life support systems in order for consenting family members, the attending physicians, and the hospital and its administrators to be relieved of civil and criminal liability?
432 So.2d at 620.
We answer the certified question in the negative and hold that court approval to terminate extraordinary life support systems was not necessary in this type of case in order to relieve the consenting family members, the attending physicians, and the hospital and its administrators of civil and criminal liability.
Francis B. Landy was admitted to John F. Kennedy Memorial Hospital in April 1981. He was terminally ill, and within two days he stopped breathing and was placed on a mechanical ventilator. He had suffered permanent brain damage and was held on the threshold of death through the use of extraordinary artificial means developed by modern medical technology. He was unable to breathe for himself and was unable to think and to give a response. A tube was placed in his trachea, and an artificial support system breathed for Mr. Landy. When placed on the ventilator, Mr. Landy was suffering from acute respiratory failure, chronic interstitial fibrosis and gastrointestinal bleeding. Over the next several days after having been placed on the mechanical ventilator, it became obvious to his doctor that, because of his neurological function and his respiratory function, it was impossible to wean him from the ventilator. His mental status continued to deteriorate. Mr. Landy's doctor diagnosed his condition as terminal.
Mrs. Landy delivered to the treating doctor a written document entitled "Mercy Will and Last Testament" that had been signed by Mr. Landy and two witnesses on April 16, 1975. As recently as February 1981, Mrs. Landy had promised her husband that if he were hospitalized she would make this document a part of his hospital record. Among other things, it stated that Mr. Landy did not wish to be kept alive through the use of extraordinary life support equipment such as a respirator.
Mr. Landy was declared incompetent on April 23, 1981, by the probate court and his wife was appointed guardian of his person. She requested that all extraordinary life support systems be discontinued. Fearing potential civil and criminal liability, the hospital, on the same day, filed a declaratory relief action asking the court to determine its rights and liabilities relating to continuation *923 or discontinuation of the artificial means that were maintaining and sustaining Mr. Landy's body and preventing his natural death. In its amended petition, the hospital stated that prior to the emergency hearing on this issue, Mr. Landy had died on April 24, 1981, but contended that this matter was not moot because there were numerous other incompetent terminal patients at the hospital who were being sustained by extraordinary artificial life support systems. The state attorney's motion to dismiss the action on the basis of mootness was denied by the trial court. The trial court decided that notwithstanding Mr. Landy's death, the issue before it was justiciable. It then held that in order to avoid potential criminal and civil liability for termination of life support systems under the facts of this case, appointment of a guardian to act on the incompetent patient's behalf, the filing of a petition for authority to order termination, and court approval were required. These cases, it concluded, must be decided by the courts on a case-by-case basis.
The hospital then appealed the trial court's decision requiring prior court approval in this type of case. The district court upheld the trial court's finding that a justiciable issue existed. It then expressly recognized that, based on the constitutional right of privacy, a terminally ill comatose patient had the same right as a conscious and competent person suffering from terminal illness to refuse or discontinue extraordinary medical treatment and that, in order for this right to be truly viable, there must be a corresponding capability to exercise it. But the district court determined that the capability of a conscious and competent terminally ill person to make this decision and the capability of Mr. Landy, who was comatose and totally unresponsive but had given direction through a "mercy will," were not equatable insofar as the exercise of that right without court approval. In the first instance, the district court recognized that court approval was not necessary, while in the second instance, it held that court approval was necessary before life-sustaining procedures could be suspended. It further explained that upon application to a court for termination, it becomes incumbent upon the court to determine what the individual would want done if he were conscious and competent. It concluded that the "mercy will," when proved by testimony or recent affidavit of at least one disinterested witness as to its due execution and as to the patient's mental capacity at the time of execution, could be received into evidence and could be considered the best evidence of the patient's intention.
Before we can answer the certified question, we must first determine what rights comatose and terminally ill persons have. We agree with the district court that terminally ill incompetent persons being sustained only through use of extraordinary artificial means have the same right to refuse to be held on the threshold of death as terminally ill competent persons.
The tremendous advancements in medical technology in the last several years have made it possible to sustain a person who has minimal brain functioning but who does not meet the definition of "brain death" under section 382.085, Florida Statutes (1983). It is now possible to hold such persons on the threshold of death for an indeterminate period of time by utilizing extraordinary mechanical or other artificial means to sustain their vital bodily functions. The procedures used can be accurately described as a means of prolonging the dying process rather than a means of continuing life.
We previously have addressed the right of terminally ill competent adults to discontinue extraordinary medical treatment in Satz v. Perlmutter, 379 So.2d 359 (Fla. 1980), wherein we adopted as our own the opinion of the District Court of Appeal, Fourth District, 362 So.2d 160 (Fla. 4th DCA 1978). Mr. Perlmutter, who was seventy-three years old, suffered from Lou Gehrig's disease for which there was no cure. Although his condition had progressed to the point of incapability of movement and inability to breathe without a mechanical *924 respirator, he was in control of his mental faculties and legally competent. He sought, with family approval, the removal of the respirator which, according to his physician, would result in his death in less than one hour. The Fourth District considered the state's interests of preservation of life, protection of third parties, prevention of suicide, and maintenance of the ethical integrity of the medical practice, and concluded that none of these outweighed Mr. Perlmutter's right to have the respirator removed from his trachea. It adopted the view of the line of cases from other jurisdictions that would allow Mr. Perlmutter the right to refuse or discontinue treatment based upon a constitutional right of privacy. As to the state's assertion of its overriding duty to preserve life, the court responded:
There can be no doubt that the State does have an interest in preserving life, but we again agree with Saikewicz [Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417 (1977)] that "there is a substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether, but when, for how long and at what cost to the individual [his] life may be briefly extended." (Id. 425-426.) In the case at bar the condition is terminal, the patient's situation wretched and the continuation of his life temporary and totally artificial.
362 So.2d at 162. Moreover, relative to the ethics of medical practice on this question, the Fourth District, drawing from the seminal case of In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976), adopted the reasoning of Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417 (1977), that prevailing ethical practice recognizes that the dying are more often in need of comfort than treatment and that the right to refuse treatment in appropriate circumstances is consistent with existing medical mores. In conclusion, the Fourth District stated that Mr. Perlmutter should be allowed to make the choice to die with dignity and explained:
It is all very convenient to insist on continuing Mr. Perlmutter's life so that there can be no question of foul play, no resulting civil liability and no possible trespass on medical ethics. However, it is quite another matter to do so at the patient's sole expense and against his competent will, thus inflicting never ending physical torture on his body until the inevitable, but artificially suspended, moment of death. Such a course of conduct invades the patient's constitutional right of privacy, removes his freedom of choice and invades his right to self-determine.
362 So.2d at 164.
This right of terminally ill patients should not be lost when they suffer irreversible brain damage, become comatose, and are no longer able to personally express their wishes to discontinue the use of extraordinary artificial support systems. We recognized in Perlmutter that the state's interest against termination of extraordinary artificial life support weakens and the individual's right to privacy increases as the bodily invasion becomes greater and the prognosis dims. This principle is just as applicable to the present case. The issue in these cases is not whether a life should be saved. Rather, it is how long and at what cost the dying process should be prolonged.
By concluding that terminally ill comatose patients have the right to refuse the continuation of extraordinary means of artificial life support, we acknowledge that there must be a means by which this right may be exercised. This right and the manner in which the corresponding capability will be exercised have been addressed in decisions from other jurisdictions, several of which are discussed at length in the Fourth District's decision.
The primary concern of these cases is that this valuable right should not be lost because the noncognitive and vegetative condition of the patient prevents a conscious exercise of the choice to refuse further extraordinary treatment. The question *925 is who will exercise this right and what parameters will limit them in the exercise of this right. In order to ensure this right, the procedure for implementing it must not be so cumbersome so as to effectually eliminate it. To require prior court approval for termination of the life support systems in this type of case is too burdensome, is not necessary to protect the state's interests or the interests of the patient, and could render the right of the incompetent a nullity.
The New Jersey Supreme Court in In re Quinlan held that the right of Karen Quinlan, who was comatose, noncognitive, and vegetative, to decide that her life should not be maintained by artificial means could be exercised by her guardian father and her family who would render their best judgment as to whether Karen would exercise her right in these circumstances. They would exercise this right in consultation with her attending physicians and the hospital ethics committee or like body, who would have to conclude that there is no reasonable probability of her ever emerging from her present condition to a cognitive sapient life and that her life support apparatus should be discontinued. Under these circumstances, if artificial life support systems were withdrawn, the court held, there would be no civil or criminal liability therefor on the part of any participant. The Quinlan court rejected the requirement of prior court approval as a general rule and maintained that as a general practice these decisions should be made within the patient-doctor-family relationship.
The Washington Supreme Court has also recently addressed the issue of who may exercise the incompetent's right to refuse further artificial death prolonging measures and how this right should be exercised. In re Coyler, 99 Wash.2d 114, 660 P.2d 738 (1983), involved an incompetent patient who had suffered massive brain damage and had become comatose. She was being kept alive by artificial life support systems. The prognosis of any meaningful existence was zero. That court found that Coyler's situation was similar to Quinlan's. It chose a course similar to Quinlan, reiterated that as a general practice these decisions are to be controlled by the patient-doctor-family relationship, and held that judicial intervention in every decision to withdraw life-sustaining treatment is not required. It expressed concern that the court could not respond in a timely manner for the relief sought and reasoned that in this situation and where physicians and family agree, court intervention would be little more than a formality. The Washington court, however, did require the appointment of a guardian to use his best judgment and to exercise, when appropriate, an incompetent's right to refuse life-sustaining treatment.
In a recent case of first impression in Florida, the Second District Court of Appeal reviewed a trial court's order authorizing the removal of a life support system from a ten-month-old infant. In re Guardianship of Barry, 445 So.2d 365 (Fla. 2d DCA 1984). In that case the infant had been on the life support system since birth, was in a permanent vegetative state with in excess of 90 percent of his brain function gone, and was without cognitive brain function. He was terminally ill, and, even if the life support system was maintained, he was not expected to live much beyond two years. His condition was permanent and irreversible.
There was no question that this infant was incompetent and, unlike Mr. Perlmutter, could not personally exercise his constitutional right of privacy to require removal of the life support system. The district court affirmed the trial court's order and concluded that the interests of the terminally ill incompetent infant outweighed those of the state and that his parents could validly assert a privacy interest on his behalf. The district court also said that where the question concerns a young child, it did not think the parents must always qualify as legal guardians and seek judicial approval to discontinue these extraordinary measures. It concluded that a decision by parents supported by competent medical advice that their young child suffers from *926 a permanent, incurable, and irreversible physical or mental defect likely to soon result in the child's death should ordinarily be sufficient without court approval. The court pointed out, however, that although judicial intervention need not be solicited as a matter of course, the courts must always be open to hear these matters on request of the family, guardian, affected medical personnel, or the state. It acknowledged that in cases where doubt exists or where there is a lack of concurrence among the family, physicians, and the hospital, or where an affected party simply desires a judicial order, then the court must be available to consider the matter.
We agree with the analyses of Quinlan, Coyler, and Barry except that we reject that part of Quinlan that requires the concurrence by a hospital "ethics committee," and we reject that part of Coyler that requires the appointment of a guardian in all such cases. We hold that the right of a patient, who is in an irreversibly comatose and essentially vegetative state to refuse extraordinary life-sustaining measures, may be exercised either by his or her close family members or by a guardian of the person of the patient appointed by the court. If there are close family members such as the patient's spouse, adult children, or parents, who are willing to exercise this right on behalf of the patient, there is no requirement that a guardian be judicially appointed. However, before either a close family member or legal guardian may exercise the patient's right, the primary treating physician must certify that the patient is in a permanent vegetative state and that there is no reasonable prospect that the patient will regain cognitive brain function and that his existence is being sustained only through the use of extraordinary life-sustaining measures. This certification should be concurred in by at least two other physicians with specialities relevant to the patient's condition.
The decision to terminate artificial life supports is a decision that normally should be made in the patient-doctor-family relationship. Doctors, in consultation with close family members are in the best position to make these decisions. The focal point of such decisions should be whether there is a reasonable medical expectation of the patient's return to a cognitive life as distinguished from the forced continuance of a vegetative existence.
This brings us to the certified question in this case. We have recognized that terminally ill incompetent persons being sustained only through use of extraordinary artificial means have the same right to refuse to be held on the threshold of death as terminally ill competent persons. Since incompetent persons may not exercise this right while they are incompetent, there must be a means by which this right may be exercised on their behalf, otherwise it will be lost. The means developed by the courts to afford this right to incompetent persons is the doctrine of "substituted judgment." Under this doctrine close family members or legal guardians substitute their judgment for what they believe the terminally ill incompetent persons, if competent, would have done under these circumstances. If such a person, while competent, had executed a so-called "living" or "mercy" will, that will would be persuasive evidence of that incompetent person's intention and it should be given great weight by the person or persons who substitute their judgment on behalf of the terminally ill incompetent.
To be relieved of potential civil and criminal liability, guardians, consenting family members, physicians, hospitals, or their administrators need only act in good faith. For them to be held civilly or criminally liable, there must be a showing that their actions were not in good faith but were intended to harm the patient. Under the circumstances of this and similar cases, prior court approval is not required. The courts, however, are always open to hear these matters if request is made by the family, guardian, physician, or hospital. Disagreement among the physicians or family members or evidence of wrongful motives or malpractice may require judicial *927 intervention upon the filing of an appropriate petition.
Accordingly, we answer the certified question in the negative and quash the decision of the district court.
It is so ordered.
BOYD, OVERTON and EHRLICH, JJ., concur.
McDONALD, J., concurs in result only with an opinion.
SHAW, J., concurs in result only.
McDONALD, Justice, concurring in result only.
I agree that the certified question should be answered in the negative. This disposes of any issue under the facts of this case. I hesitate to plunge further and suggest answers to factual situations which are not before us and would prefer stopping this opinion by responding to the certified question.
If required to go further, my present inclination is to require the appointment of a guardian to act for an incompetent adult. An incompetent can act only through a guardian; no one but a guardian can substitute his judgment for a ward. Certainly, if an incompetent cannot convey property except through a guardian, an equal safeguard should apply to the cessation of life. The guardian is charged with the responsibility of acting in the best interests of the ward and would be so guided when exercising his discretion in this sensitive area. That guardian would be authorized to consent to the termination of life support systems when that consent is made in conjunction with competent medical advice as set forth in the majority opinion.