In the Matter of the CONSERVATOR-
SHIP OF Rudolfo TORRES,
Conservatee.

No. C1–84–761.

Supreme Court of Minnesota.

Nov. 2, 1984.

Timothy W. Regan, Minneapolis, for appellant.

Marilyn Maloney, Minneapolis, for Hennepin County.

Joseph Beaton, Minneapolis, for conservator.

John R. Kenefick, St. Paul, amicus curiae for Minnesota Soc. of Hosp.

David Feinwachs, John Kingrey, Minneapolis, amicus curiae for Minnesota Hosp. Assoc.

Kathy Meyerle, Minneapolis, amicus curiae for Minnesota Medical Assoc.

TODD, Justice.

Rudolfo Torres has been comatose and dependent on life support systems since July 14, 1983. A conservator was appointed for Mr. Torres and on March 9, 1984, a hearing was held before the Hennepin County Probate Court to determine the appropriate level of medical care for Mr. Torres. Mr. Torres' interests were represented in that proceeding by his conservator and by court-appointed counsel. All attorneys involved have performed in the finest traditions of the legal profession in adversely presenting the issues to the probate court and this court. After hearing the arguments of counsel and considering the medical evidence, the probate court au-

thorized the conservator to order removal of Mr. Torres' respirator. That decision was appealed by Mr. Torres' court-appointed counsel. We affirm.

On June 2, 1983, Mr. Torres, age 57, was injured in a two-story fall at his residence. He was admitted to the Hennepin County Medical Center with extensive chest and head injuries. He was treated for those injuries and by July 14, 1983, he was able to follow simple commands, make one-word responses, and walk with assistance.

On July 14, 1983, Mr. Torres was found in the early hours of the morning with a "posey" around his neck, in a state of complete cardiopulmonary arrest. A "posey" is a restraining device which straps a patient into a hospital bed to keep the patient from falling out. The posey had been attached to a stationary, rather than a movable part of the bed, and had strangled Mr. Torres when the back part of the bed came forward.

Mr. Torres was resuscitated but was found on examination to have severe anoxic encephalopathy; that is, he had suffered massive and irreversible brain damage due to a lack of oxygen. Mr. Torres was then placed on a respirator, on which he has remained dependent. At the March 6, 1984 hearing before Judge Melvin J. Peterson of the Hennepin County Probate Court, counsel for Mr. Torres and the Hennepin County Medical Center stipulated that Mr. Torres has a potential cause of action based on negligence against the Hennepin County Medical Center.

Mr. Torres is comatose. He is not, however, "brain dead" under the traditional definition (i.e. a cessation of *all* brain functions) because laboratory studies show a "poor but definite cerebral [blood] flow" and "very rudimentary evidence of low medullary brain stem function."

In his order of April 6, 1984, Judge Peterson found that:

Aside from spontaneous twitching of his tongue and intermittent twitching of his left thumb, [Mr. Torres displays] no motor movement, either spontaneously or in response to central or acral pain.

He appears to have no reflexes, no toe signs, no corneal response, nor other indication of motor response. After these several months have passed, there is no evidence of cortical functions and only very rudimentary evidence of low medullary brain stem function. Some respiratory efforts and the twitching are noted. The medical evidence indicates within a reasonable medical certainty that Rudolfo Torres has sustained massive irreversible cerebral cortical and brain stem damage and has no reasonable chance of any recovery. That he will not recover as a mentating human being and will not recover consciousness nor regain an ability to communicate or respond or regain any ability to use any of his extremities. The medical evidence submitted supports the proposition that the maintenance of the breathing functions through the use of a respirator should be discontinued. The foregoing conclusions are supported by the medical opinion of Dr. Steven Lebow, who was appointed as an independent medical examiner by the Court. The patient will continue indefinitely to be unresponsive and in a vegetative state until he dies. The prognosis for his recovery is nil. The patient is therefore totally incompetent and cannot participate in any degree or manner whatsoever in any decision-making process.

Court involvement in the case of Rudolfo Torres began with the appointment of attorney at law Timothy Regan to represent Mr. Torres in a conservatorship proceeding initiated by the Hennepin County Medical Center. On October 5, 1983, Judge Peterson appointed Michael J. O'Loughlin conservator of the person and estate of Mr. Torres. Neither the conservator nor the attorney appointed to represent Mr. Torres was authorized by the court to bring suit on behalf of Mr. Torres. The conservator was granted the power "to petition the court for approval to discontinue treatment or withhold treatment, if deemed by the conservator to be in the conservatee's best interests." The court also extended the appointment of Mr. Regan, permitting him

to represent Mr. Torres in later proceedings.

At a prehearing conference on January 6, 1984, Mr. Torres' conservator requested a full evidentiary hearing be held to determine the appropriate level of medical care for Mr. Torres. The hearing requested was held on the motion of the Hennepin County Attorney on March 9, 1984. Present at that hearing were Mr. Regan, the court-appointed counsel for Mr. Torres; Marilyn Maloney and George Elwell, Assistant Hennepin County Attorneys, appearing on behalf of the Hennepin County Medical Center; Michael J. O'Loughlin, the conservator of Mr. Torres; and Joseph G. Beaton, Jr., counsel for the conservator.

Four witnesses testified at the hearing.

Mr. O'Loughlin, the conservator, urged the court to permit removal of Mr. Torres' respirator. His recommendation was based partly on his perception of what Mr. Torres would want and partly on the prognosis of Dr. Steven S. Lebow, the neurologist he had hired to examine Mr. Torres.

David Torres, Rudolfo's first cousin, testified that he had seen Rudolfo "at least once a week" since 1972 and based on his knowledge of his cousin's beliefs, he believed Rudolfo would want to have the respirator removed. David Torres also stated that he had no interest in pursuing any claim he might have as Rudolfo's cousin against Hennepin County.

James Garrity, Rudolfo Torres' best friend, testified as to Mr. Torres' unwillingness to wear a pacemaker and his belief that Mr. Torres would want to have the respirator removed.

Dr. Ronald E. Cranford, a nationally respected neurologist, gave testimony on Mr. Torres' medical condition. He stated that Mr. Torres has no chance of regaining consciousness.

Dr. Cranford was questioned about his work on the David Mack case.[1] Officer Mack regained consciousness despite Dr. Cranford's prognosis that he would not. Dr. Cranford explained that Mack's "recovery" was highly unusual and that Mr. Torres is "more severely and extensively brain damaged" than David Mack.

After noting some of the differences in the two cases, Dr. Cranford was asked to predict the consequences of removing Mr. Torres' respirator. He replied:

That's hard to know for sure. We think he probably can't sustain respirations for any variable period of time, but we can't say with any degree of certainty. He could die within a few minutes; he may continue for hours or days, probably not weeks.

Dr. Cranford also testified that he did not believe Mr. Torres should be "weaned" from the respirator despite the suggestion that "weaning" be tried. He recommended that the respirator be removed.

The testimony of Dr. Cranford does not differ in any significant way from the deposition testimony of Dr. Lebow, the neurologist hired by the conservator to examine Mr. Torres. Dr. Lebow believes Mr. Torres will die if the respirator is removed and that it should be removed because Mr. Torres has "no chance of recovering as a mentating human being."

The record also includes the reports of three area Biomedical Ethics Committees which outline the procedures they would use to determine the appropriate treatment for someone in Mr. Torres' condition.[2]

1. David Mack was a Minneapolis police officer who was shot after entering a home in an attempt to execute a search warrant. Officer Mack, like Rudolfo Torres, was diagnosed by Dr. Cranford as being permanently comatose. Officer Mack, however, regained consciousness. The President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research noted that Macks' recovery was highly unusual. *See Deciding to Forego Life-Sustaining Treatment* at 179.

2. A hospital biomedical ethics committee is "a multi-disciplinary group of health care professionals within a health care institution that has been specifically established to address the ethical dilemmas that occur within that institution. At the present time, these dilemmas frequently concern the treatment or non-treatment of patients who lack decision-making capabilities." R. Cranford and A. Donderal, *The Emergence of Institutional Ethics Committee*, Law, Medicine, and Health Care (Feb. 1984). Comprised of

These reports support the recommendation of Drs. Cranford and Lebow that Mr. Torres' respirator be removed.

The only known living relatives of Rudolfo Torres are his cousin, David Torres, who testified at the hearing, and Rudolfo's aunt, Louise Valdez Torres. Ms. Torres, age 78, raised Rudolfo from infancy and resides in Corpus Christi, Texas. Ms. Torres was informed of the proceedings, but was unable to attend because of her advanced age and poor health. Ms. Torres did send a letter indicating her awareness of Mr. Torres' condition and her belief that he "would not wish to be sustained by mechanical devices." This letter was never received into evidence. Judge Peterson, however, took notice of it as part of the file from previous hearings.

On April 6, 1984, Judge Peterson issued an order granting the conservator authority to have Mr. Torres removed from the respirator even though it may result in his death. Judge Peterson further ordered that Mr. Torres be cared for in a manner maintaining human dignity until natural death.

Mr. Regan, attorney for Mr. Torres, appealed Judge Peterson's order to the Court of Appeals. This court granted a petition for accelerated review. Judge Peterson's order has been stayed during the pendency of this appeal.

The issues presented are:

1. Does the court have the authority to order discontinuance of medical life support procedures when death may result from that discontinuance?

2. Was the order of the probate court clearly erroneous in light of the evidence before it?

1. Whether a court has the authority to order discontinuance of medical life support systems is a question of first impression in Minnesota. Many other states, however, have already confronted the issue. Those courts which have considered the question have, for the most part, followed the lead provided by the New Jersey Supreme Court in its widely publicized decision, *In Re Quinlan*, 70 N.J. 10, 355 A.2d 647 (1976), *rev'g* 137 N.J.Super 227, 348 A.2d 801 (Ch.Div.1975), *cert. denied*, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).

*Quinlan* arose out of a dispute between Karen Quinlan's father and her doctor over what medical care was appropriate for Karen who was diagnosed as being in a chronic, vegetative state. *Quinlan*, at 18, 355 A.2d at 651. Karen's father sought to be appointed guardian of his daughter's person and estate for the announced purpose of removing her life supports. Karen's doctor opposed their removal because he was concerned that removing them might violate medical ethics and expose him to malpractice liability. *Id.*

The trial court appointed Karen's father guardian of her estate, but refused to appoint him guardian of her person thereby precluding him from authorizing removal of Karen's life support systems. On appeal, the New Jersey Supreme Court reversed the trial court and appointed Karen's father guardian of her person with the specific right to authorize disconnection of her life supports. *Id.* at 53, 355 A.2d at 671. The court conditioned the guardian's right to order removal of Karen's life support equipment upon the concurrence of her family in that decision and upon her doctor's determination that Karen has no reasonable hope of ever emerging from her comatose state. The court also required the doctor's opinion to have the support of a hospital "Ethics Committee". Finally, the court held that no criminal responsibility or malpractice liability could be imposed upon any person involved in the disconnection process. *Id.* at 54–55, 355 A.2d 671–72.

physicians, nurses, therapists, clergy, social workers and attorneys who represent a variety of disciplines, interests and points of view, these committees are uniquely suited to provide guidance to physicians, families and guardians when ethical dilemmas arise. R. Cranford and P. Jackson, *Neurologists and the Hospital Ethics Committee*, 4 Seminars in Neurology 15 (March, 1984).

The facts in this case are somewhat different. Unlike Karen Quinlan, Rudolfo Torres has no immediate family. His physician recommends, rather than opposes, the removal of his life supports. Three independent hospital "Ethics Committees" have already concurred in the decision of Mr. Torres' physician. Lastly, the lower court, upon conclusion of an adversarial hearing, has authorized the conservator (guardian) to remove Mr. Torres' respirator. Thus, we are directly confronted with the authority of the court to issue such an order.

█ The appellant maintains that neither trial courts nor conservators are authorized by Minnesota's guardianship statutes, Minn.Stat. § 525.539 *et seq.* (1982), to order the termination of a conservatee's life support systems. In fact, the Minnesota Legislature has "taken pains," he argues, to carefully limit the scope of a conservator's authority over a conservatee's medical care. The relevant statutory provision, Minn.Stat. § 525.56, subd. 3 (1982) provides that:

> The duties and powers * * * which the court may grant to a conservator of the person include, *but are not limited to:* * * * (4)(a) The power to give any *necessary consent* to enable the ward or conservatee to receive *necessary* medical or other professional care, counsel, treatment or service, except that no guardian or conservator may give consent for psychosurgery, electroshock, sterilization or experimental treatment of any kind unless the procedure is first approved by order of the court as provided in this clause. (emphasis added)

*Id.*

Appellant insists, on the basis of this language, that the conservator may only be given the power to consent to necessary medical care and argues that a conservator's order to remove a conservatee's life supports is not a "consent to necessary medical care."

Appellant's argument may accurately describe the scope of a conservator's power if the conservator is granted only the power

set forth at Minn.Stat. § 525.56, subd. 3 (4)(a) (1982). The language cited, however, does not purport to limit the power of a probate court to grant a conservator greater authority over the medical care of the conservatee. The provision cited simply requires the conservator to have court approval before consenting to more controversial medical procedures on behalf of the conservatee.

Respondents contend that a conservator must have the power to refuse treatment on behalf of the conservatee, if the conservator's "consent" is to have meaning. They argue that a conservator's order to remove a conservatee's life supports may be equated with a refusal to consent to further medical treatment.

We agree with respondents' contention that Minn.Stat. § 525.56, subd. 3 (4)(a) (1982), grants the guardian greater authority over the medical care of the conservatee than simply the power to consent to medical care. The provision in (4)(a) is qualified by its lead-in sentence which states that the "duties and powers * * * which the court may grant to a conservator of the person include, *but are not limited to*" those specifically described. *Id.*, subd. 3. Thus, we believe that if the conservatee's best interests are no longer served by the maintenance of life supports, the probate court may empower the conservator to order their removal despite the absence of a specific provision in Minn.Stat. § 525.56 (1982) which authorizes the court to do so. These same powers may be granted to a conservator by the court. *Id.*, subd. 3 (1982).

The probate court's authority to issue such an order may be upheld as an exercise of its jurisdiction under the Minnesota Constitution. Article VI, § 11 of the Minnesota Constitution requires that "Original jurisdiction in law and equity for * * * all guardianship and incompetency proceedings, * * * shall be provided by law." This court has held that "while the Legislature may regulate the practice in probate court, it cannot deprive that court of its constitutional jurisdiction by failing to make provision by statute for the exercise thereof."

*State ex rel. Preis v. O'Brien,* 186 Minn. 432, 435, 243 N.W. 434, 435 (1932). We believe this constitutional grant of jurisdiction to the Minnesota Probate Courts necessarily includes the authority to hear cases regarding the removal of a conservatee's life support systems.

The trial court based its order, in part, on its power to grant declaratory relief. The Minnesota Legislature enacted Minnesota's Uniform Declaratory Judgments Act, Minn. Stat. § 555.01 *et seq.* (1982) "to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations * * *." Minn.Stat. § 555.12 (1982). Insofar as the Legislature has also directed that the Act "be liberally construed and administered", *Id.*, it too provides authority for the probate court's order of April 6, 1984.

A final source of the probate court's authority to order removal of a conservatee's life supports lies in Minnesota's Patients' and Residents of Health Care Facilities; Bill of Rights, Minn.Stat. § 144.651 (Supp.1983). The Patients' Bill of Rights guarantees, among other things, the right of patients "to participate in the planning of their health care" *Id.*, subd. 10 and the right "to refuse treatment." *Id.*, subd. 12. The statute also provides that "Any guardian or conservator * * * may seek enforcement of these rights on behalf of a patient * * *." Minn.Stat. § 144.651, subd. 1 (Supp.1983). When read together, these provisions implicitly provide the probate court with authority to decide whether a conservatee's life support systems should be terminated.

■ Under Minnesota law, a probate court must act in the "best interests" of the ward or conservatee in a guardianship proceeding. *In re Schober,* 303 Minn. 226, 230, 226 N.W.2d 895, 898 (1975). Appellant argues, as a matter of law, that the "best interests" of a conservatee cannot be served by the removal of life supports when doing so may result in the conservatee's death. This argument has an appealing simplicity; it has little support, however, among those who have considered the plight of individuals like Mr. Torres.

The President's Commission for the Study of Ethical Problems in Medicine and Biomedical Research devotes a full chapter of its 1983 report, *Deciding to Forego Life-Sustaining Treatment,* to consideration of patients who have permanently lost consciousness. The Commission's conclusions regarding the interests of such patients are worth quoting in full:

The primary basis for medical treatment of patients is the prospect that each individual's interests (specifically, the interest in well-being) will be promoted. Thus, treatment ordinarily aims to benefit a patient through preserving life, relieving pain and suffering, protecting against disability, and returning maximally effective functioning. If a prognosis of permanent unconsciousness is correct, however, continued treatment cannot confer such benefits. Pain and suffering are absent, as are joy, satisfaction, and pleasure. Disability is total and no return to an even minimal level of social or human functioning is possible.

Any value to the patient from continued care and maintenance under such circumstances would seem to reside in the very small probability that the prognosis of permanence is incorrect. Although therapy might appear to be in the patient's interest because it preserves the remote chance of recovery of consciousness, there are two substantial objections to providing vigorous therapy for permanently unconscious patients.

First, the few patients who have recovered consciousness after a prolonged period of unconsciousness were severely disabled. The degree of permanent damage varied but commonly included inability to speak or see, permanent distortion of the limbs, and paralysis. Being returned to such a state would be regarded as of very limited benefit by most patients; it may even be considered harmful if a particular patient would have refused treatments expected to produce this outcome. Thus, even the extremely small likelihood of "recovery" cannot be

equated with returning to a normal or relatively well functioning state. Second, long-term treatment commonly imposes severe financial and emotional burdens on a patient's family, people whose welfare most patients before they lost consciousness, placed a high value on [sic]. For both these reasons, then, continued treatment beyond a minimal level will often not serve the interests of permanently unconscious patients optimally. (Commission's Report at 181–183).

■ By guaranteeing the right of a patient to refuse medical treatment, Minn. Stat. § 144.651, subd. 12 (Supp.1983), the Minnesota Legislature has recognized that a patient's "best interests" may not be served by continued medical treatment. Expressing a similar regard for the rights of an incompetent, the Legislature has prohibited a conservator from consenting to medical care which would violate the known conscientious, religious, or moral beliefs of the conservatee. Minn.Stat. § 525.-56, subd. 3 (4)(a) (1982). Thus, simply equating the continued physical existence of a conservatee, who has no chance for recovery, with the conservatee's "best interests" appears contrary not only to the weight of medical authority, but also to those indications of legislative opinion which exist. At a minimum, any determination of a conservatee's "best interests" must involve some consideration of the conservatee's wishes.

The authority of a trial court to order the removal of a conservatee's extraordinary life supports is closely intertwined with the right of an incompetent to forego life sustaining treatment. Those jurisdictions which have already considered the issues raised on this appeal have uniformly upheld the right of an incompetent to refuse life sustaining treatment and the authority of their trial courts to order the removal of an incompetent's life supports at the request of the incompetent's guardian or conservator. *Severns v. Wilmington Medical Center, Inc.,* 421 A.2d 1334 (Del.1980); *John F. Kennedy Memorial Hospital, Inc. v. Bludworth,* 452 So.2d 921 (Fla.1984), *aff'g,* 432

So.2d 611 (Fla.Dist.Ct.App.1983); *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417. (1977); *In re Quinlan,* 70 N.J. 10, 355 A.2d 647 (1976), *cert. denied* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); *In re Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 *cert. denied,* 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981); *Leach v. Akron General Medical Center,* 68 Ohio Misc. 1, 426 N.E.2d 809 (1980); *In re Colyer,* 99 Wash.2d 114, 660 P.2d 738 (1983).

■ The right of an individual to forego life sustaining treatment has been based upon a constitutional right of privacy and/or the common law right to be free from invasions of one's bodily integrity. The individual's right to refuse treatment also includes the right to order the disconnection of extraordinary life support systems. These rights have not been considered absolute and have been balanced against the right of a state to protect its citizens. Those state interests which have been identified include—(1) the preservation of life; (2) the prevention of suicide; (3) the protection of innocent third parties; and (4) the preservation of the ethical integrity of the medical profession. *See,* Comment, *Law at the Edge of Life: Issues of Death and Dying,* 7 Hamline L.Rev. 431, 440 (1984). The individual's right of privacy may be overridden, however, only if the state's interest are compelling. *Severns v. Wilmington Medical Center, Inc.,* 421 A.2d 1334 (Del.1980); *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977); *In re Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266, *cert. denied,* 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981); *In re Colyer,* 99 Wash.2d 114, 660 P.2d 738 (1983).

Every jurisdiction which has considered the position of someone like Mr. Torres has permitted a guardian to assert the right of the incompetent to order the disconnection of life supports. We conclude that under the constitutional and statutory authority presently existing, the Minnesota courts have the power to authorize a conservator

to order the removal of a conservatee's life support systems.

2. Having concluded that the court had authority to issue its order, we must now determine if that order was clearly erroneous under the facts of this case.

In the present case, those interests of the state which might be served by having Mr. Torres maintained on a respirator are not, on balance, compelling. Therefore, we may focus our discussion on appellant's claim of trial court error.

Appellant's attacks on the order itself fall into three general categories. First, he contends that the order does not serve Mr. Torres' "best interests". Secondly, he argues that Mr. Torres' right to due process was violated. Thirdly, he maintains that the order was based on speculative and hearsay evidence which should not have been considered.

■ Appellant claims that "no conceivable interest of Mr. Torres could be served by his being deceased." This assertion rests, in part, upon the fact that Mr. Torres cannot feel pain and, thus, his death will not prevent future suffering. Appellant's argument neglects the possibility that Mr. Torres might not want his life prolonged without a hope for recovery. Society's concern for the right of an individual to die with dignity has already prompted the enactment of "right to die" legislation in eleven states. Comment, *Law at the Edge of Life: Issues of Death and Dying*, 7 Hamline L.Rev. 431, 436 (1984). Mr. Torres may well have wished to avoid, as one writer vividly put it, "The ultimate horror [not of] death but the possibility of being maintained in limbo, in a sterile room, by machines controlled by strangers." Steel, *The Right to Die: New Options in California*, 93 Christian Century [July-Dec. 1976].

Appellant contends that Mr. Torres' best interests are not served by an order which will effectively eliminate the claims he may have against Hennepin County or others as a result of the July 14, 1983 accident at the Hennepin County Medical Center. Appellant notes that a wrongful death claim against Hennepin County would survive Mr. Torres' death, but feels that it may have no value "in view of the fact that Mr. Torres apparently had no dependents." Any determination of Mr. Torres' best interests, however, should not be confined to financial considerations alone. In addition, the record discloses that the Hennepin County Medical Center has reexamined its policies concerning the use of poseys in an effort to prevent a reoccurrence of the tragic accident which left Mr. Torres comatose. As a consequence, we believe that the trial court did not clearly err in determining that Mr. Torres' best interests would be served by its order.

■ Appellant also challenges the trial court's order on due process grounds. He objects to the fact that it was Hennepin County and not the conservator who filed the petition requesting an evidentiary hearing "on the medical care to be provided to Rudolfo Torres." While this is true, the conservator did suggest that a full evidentiary hearing be held. Appellant also assails the manner in which the conservator asserted Mr. Torres' right to forego life sustaining treatment. Nonetheless, it is clear that the conservator believes that Mr. Torres would want to have the respirator removed.

Appellant's due process challenge rings hollow in light of the facts: A full evidentiary hearing on the recommended care of Mr. Torres was held. Full and complete notice was given to all concerned. All interests were represented at the hearing. The testimony of the conservator, the examining physicians, and the family and friends of Mr. Torres was heard. Finally, Judge Peterson, who presided at the hearing, was satisfied that Mr. Torres would have chosen to forego life sustaining treatment were he able to speak.

Appellant's last contention is that the "trial court erred in admitting speculative and hearsay evidence of little probative value." Appellant objected, at the hearing, to the testimony of David Torres, Mr. Torres' cousin, when asked for his impression as to

what Mr. Torres' wishes might be. Appellant also objected to the conservator's testimony regarding similar opinions expressed by Mr. Torres' aunt in a letter to the court. That letter was a part of the court's file but was never offered into evidence.

■■■ Appellant argues that the evidence regarding Mr. Torres' views on life sustaining treatment "falls far short of the evidentiary standard which ought to be met for a life and death issue such as the present." Respondents claim that the probate judge should be given wide latitude in admitting testimony because "the proceeding is not by its nature an adversarial one." Under Minnesota law, rulings on the admissibility of evidence are left to the sound discretion of the trial court. *Colby v. Gibbons*, 276 N.W.2d 170, 175 (Minn.1979). The record in this case does not support a finding that the trial court abused its discretion. We conclude that the trial court's order was not clearly erroneous under the facts of this case.

The medical profession can now artificially maintain the heart and lung functions of a patient whose brain is partially or wholly destroyed. While this capability is commendable, it creates a wide variety of legal, medical, and ethical problems.[3] This case has presented the court with an opportunity to consider a number of issues of great societal concern. We have declined to do so at this time, however, since we believe the legislative process would be a superior method of insuring public input into such vital questions.

We hold under the facts in this case that a court order was necessary,[4] that the conservator had the right to issue his substituted judgment for that of the comatose conservatee, and that the court's order permitting the removal of Mr. Torres' respirator was not clearly erroneous.

Affirmed.

KELLEY, Justice (concurring specially).

I concur in the decision, but I disagree with the last sentence of footnote 4. I am of the view that in all cases when the decision of continued life or likely death is involved there should be a court procedure similar to the procedure followed in this case.

YETKA, Justice (concurring specially).

I join the special concurrence of Justice Kelley.

PETERSON, Justice (concurring specially).

I agree with Justice Kelly that in any case—including one in which there is unanimity among physician, family, and hospital ethics committee—the ultimate withdrawal of life support should not occur before approval by a court in a judicial proceeding appropriate to the posture of the particular case. In most cases it is probably unlikely that such cases would be protracted, not unlike many other situations of less moment where judicial orders of approval may be largely pro forma. A requirement of judicial oversight is a basic recognition of the state's undoubted interest in the safety of its citizens.

■■■■■

---

**3.** *See e.g.* Comment, *Law at the Edge of Life: Issues of Death and Dying*, 7 Hamline L.Rev. 431, 434 (1984); President's Comm'n for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Defining Death, Medical, Legal and Ethical Injury in the Determination of Death*, (July 1981).

**4.** At oral argument it was disclosed that on an average about 10 life support systems are disconnected weekly in Minnesota. This follows consultation between the attending doctor and the family with the approval of the hospital ethics committee. It is not intended by this opinion that a court order is required in such situations.