487 So.2d 1185 (1986)
Roswell GILBERT, Appellant,
v.
STATE of Florida, Appellee.
No. 85-1129.
District Court of Appeal of Florida, Fourth District.
April 30, 1986.
Rehearing Denied May 22, 1986.
*1186 Joseph A. Varon, Hollywood, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Richard G. Bartmon, Asst. Atty. Gen., West Palm Beach, for appellee.
WALDEN, Judge.
Upon trial by jury, Roswell Gilbert was found guilty of the premeditated murder of his wife, Emily, in contravention of section 782.04(1)(a)1, Florida Statutes (1981).[1] He, *1187 at age 75, was sentenced to life imprisonment. Under section 775.082, Florida Statutes (1981), there is a mandatory minimum sentence of 25 years. Thus, Mr. Gilbert would be incarcerated until he reached the age of 100 years before he would be eligible for release.
Mr. and Mrs. Gilbert lived together in a Fort Lauderdale condominium. They had been married for 51 years. Emily suffered from osteoporosis and Alzheimer's Disease. Her physician, Dr. Hidalgo, had prescribed Percodan to help alleviate the pain of the arthritis. The dosage was for moderate pain. There is no doubt that she was in pain because of the osteoporosis and sometimes confused because of the Alzheimer's.
At trial, appellant's attorney called a couple of Emily's friends, in addition to Dr. Hidalgo, to testify as to her physical and emotional condition before her death.
On direct examination Lillian Irvin testified that Emily was in a lot of pain because of the arthritis. One day, while Lillian was in her condominium office, Emily came in looking for appellant. She was upset and crying. He was in a condominium meeting, so Lillian called him out of the meeting to come and attend to his wife. When he arrived Emily said, "I'm so sick, I want to die, I'm so sick ... Ros I want to die, I want to die."
On cross-examination Lillian testified that Emily would come down from her tenth floor apartment every day to either look for appellant or walk around the condominium pool. The couple also went out to lunch every day.
Jacqueline Rhodes also testified for the defense. She stated that Emily had deteriorated during the last two years of their acquaintance. She was forgetful at times and in pain because of her back. In Jacqueline's opinion appellant had always been very kind and attentive to his wife.
On one particular occasion, Jacqueline went to the Gilberts' apartment and saw Emily lying on the sofa crying and looking very sick. This struck Jacqueline as particularly indicative of Emily's condition.
Appellant testified in his own defense. He recounted their lives together from the first incident of osteoporosis, which was approximately eight years before her death. As time progressed the arthritis worsened and then Emily began to lose her memory. This was diagnosed as Alzheimer's Disease. The manifestation of Emily's illness which appeared to bother appellant the most was her increased dependence on him.
Appellant then described the events which led up to Emily's death. On March 2, Emily had another bout with osteoporosis. The next day he took her to the hospital. Emily did not want to stay there and became uncooperative and insisted on going home. Finally, appellant decided it was best to take her home. This made Emily feel better.
On March 4, the day of the killing, appellant took Emily out to lunch as usual. When they got back he gave her four Percodan tablets, put her on the sofa and went to a condominium meeting. A few minutes later Emily followed him down to the meeting. Appellant left the meeting and took Emily back to their apartment. As she lay on the sofa, she said, "Please, somebody help me. Please, somebody help me." In his own words this is how appellant killed Emily:
Who's that somebody but me, you know, and there she was in pain and all this confusion and I guess if I got cold as icewater that's what had happened. I thought to myself, I've got to do it, it's got to be mine, I've got to end her suffering, this can't go on.
I went in. The gun was up on the top shelf with a clip in it. I loaded it with *1188 one shell, pulled the clip out. I don't like to leave loaded guns laying around.
Well, then I shot her in the head. I felt her pulse, I could still feel it. I thought, Oh, my God, I loused it up.
I went back to the shop. This time I was shaking. I wasn't cold as ice at all. Back to the shop, put another round in the gun, came back, put another bullet in her head.
The only comforting thing, the first shot there was no convulsive reaction, just her right hand shook like that fast and her head went over the impacted bullet and it slowly came down, didn't make any noise except her mouth just opened slowly like that and then, you know, I thought it hit so fast she didn't know what happened. Then I felt her pulse. It turned out I was wrong. The pulse keeps going after this episode for a few minutes anyway. I didn't know that. I just thought I had, you know  and the second time I fired I felt the pulse seemed to be gone. So I somehow got to the telephone and called the security guard downstairs and I said, "I just killed my wife," and 
His attorney continued the questioning:
[Mr. Varon:] Ros, why did you use a gun?
[Appellant:] I think poison is a horrible way to die. There's no such thing as instantaneous death with poison. I know nothing about poisons but I know that and I know nothing about poisons, I didn't have any. If I did have any, I wouldn't know how to use it. I'd probably louse it up, just get her terribly sick and that's not going to do any 
Q Ros 
A Firing a shot in the head will cause cessation of all consciousness in one millisecond, one thousandth of a second. I'm sure she didn't even hear the gun go off and I've been asked that question.
... .
Q Why did you think that or did you feel that you're the only one that could have ended her suffering?
A Natural conclusion. I can't go to the medical people. They have no cure for Alzheimer's. The osteoporosis was getting worse slowly in time. Everything looked like it was converging to a climax.
Q Ros 
A I couldn't see any other end than her dying. If I put her in a nursing home, well, after that hospital thing I don't think a nursing home would take her. The hospital certainly wouldn't take her.
So I put her in a nursing home and they won't let me stay there and she's separated from me. It would be a horrible death for her. She would die.
Then I can't confide in my friends without getting them involved, you know, in this sort of thing that I did. I couldn't go to the doctor. He is a professional. He is duly bound to report it to the authorities and they would pull me out of the picture.
The whole thing was a mess and the only solution to me was to terminate her suffering. That's all.
Q Now, Ros 
A If I could continue?
Q Yes, please.
A I didn't consider what would happen to me at all. The only important thing was to terminate her suffering. I could take care of whatever happens to me and it's happening right now and that was of no consequence to me.
Sure, I know I was breaking the law but there seems to be things more important than the law, at least to me in my private tragedy. So it's murder. So what?
On cross-examination appellant testified that he had never talked with Emily about killing her and had decided to shoot her from behind so she would not see the gun.
The record reveals that up until the time of her death, Emily was always neat and well-dressed, wearing makeup, jewelry, and coordinated outfits. She also went to the hairdresser every two weeks up until the last week of her life.
*1189 Her doctor testified that Emily could have lived for another five to ten years. She was never bedridden or completely incapacitated.
The appellate presentation on behalf of appellant has been skilled, sensitive and innovative. Regardless, the task facing counsel was impossible or insurmountable in light of the uncontroverted facts and the current state of the law. While we will and do affirm, we shall discuss the several points:
Point 1. It is asserted on behalf of appellant that the trial court erred in refusing to give this charge on the word "felonious."
The Court will give you the definition of the word "feloniously" as follows:
Of, pertaining to, or having, the quality of felony. Proceeding from an evil heart or purpose; done with a deliberate intention of committing a crime. Without color of right or excuse. Malignantly; maliciously. Acting with a felonious intent; i.e., acting with intent to commit a felony.
We hold that no error was committed because the matter was adequately and correctly covered by the standard jury instruction on first degree murder which was given. That instruction provided:
In this case, Roswell Ward Gilbert is accused of murder in the first degree. Murder in the first degree includes the lesser crimes of murder in the second degree and manslaughter, all of which are unlawful. A killing that is excusable or was committed by the use of justifiable deadly force is lawful.
If you find Emily Gilbert was killed by Roswell Ward Gilbert, you will then consider the circumstances surrounding the killing in deciding if the killing was murder in the first degree or was murder in the second degree or was manslaughter or whether the killing was excusable or resulted from justifiable use of force, deadly force, that is.
Justifiable homicide: The killing of a human being is justifiable homicide and lawful if necessarily done while resisting an attempt to murder or commit a felony upon the defendant or to commit a felony in any dwelling house in which the defendant was at the time of the killing.
Excusable homicide: The killing of a human being is excusable and therefore lawful when committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent or by accident or misfortune in the heat of passion upon any sudden and sufficient provocation or upon a sudden combat without any dangerous weapon being used and not done in a cruel or unusual manner.
I will now instruct you on the circumstances that must be proved before Roswell Ward Gilbert may be found guilty of murder in the first degree or any lesser included crime.
Before you can find the defendant guilty of first degree premeditated murder the State must prove the following three elements beyond a reasonable doubt:
(1) Emily Gilbert is dead;
(2) The death was caused by the criminal act or agency of Roswell Ward Gilbert; and
(3) There was a premeditated killing of Emily Gilbert.
Killing with premeditation is killing after consciously deciding to do so. The decision must be present in the mind at the time of the killing. The law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill and the killing.
The period of time must be long enough to allow reflection by the defendant. The premeditated intent to kill must be formed before the killing. The question of premeditation is a question of fact to be determined by you from the evidence. It will be sufficient proof of premeditation if the circumstances of the killing and the conduct of the accused convince you beyond a reasonable doubt *1190 of the existence of premeditation at the time of the killing.
Moreover, the term felonious is mere surplusage. See United States v. Harvey, 428 F.2d 782 (9th Cir.1970). The crime of first degree murder as defined in section 782.04(1)(a)1, Florida Statutes (1981), does not include the definition of "felonious" as proposed by appellant, i.e., involving evil, malicious or malignant motivation or intent.
Finally, it is not reflected how appellant was prejudiced or how the outcome of the trial would have been different but for the exclusion.
[A] judgment will not be reversed for failure to give a particular charge where, as here, on the whole, the charges as given are clear, comprehensive and correct.
Zuberi v. State, 343 So.2d 664 (Fla. 3d DCA 1977).
Point 2. We hold that no error was committed by refusal of the court to instruct the jury on euthanasia and substituted judgment per these two requested instructions:
DEFENDANT'S REQUESTED INSTRUCTION NO. 4
The Court instructs the jury of the definition of Euthanasia to be:
The act or practice of painlessly putting to death persons suffering from incurable and distressing disease as an act of mercy.
The judge denied this instruction because there was no supporting evidence.
DEFENDANT'S REQUESTED INSTRUCTION NO. 5
In the law governing mental health there is a doctrine of "substitute judgment" that permits close family members to substitute their judgment for what they believe a terminally ill person would have done under certain circumstances.
If such person had executed a "mercy" will, that will is persuasive of that person's intention and it should be given great weight by the person or persons who substitute their judgment on behalf of the terminally ill individual.
In such case, in order for consenting family members, attending physicians, hospitals and its administrators to be relieved of civil and criminal responsibility such parties need only to act in good faith.
In this case one of the principal defenses interposed by the Defendant, ROSWELL GILBERT, is for what he believed his wife wanted done under the circumstances and that he acted in good faith.
Euthanasia is not a defense to first degree murder in Florida and this court has been furnished with no law or statute to the contrary.
If a requested instruction is not a legal defense then there is no error in refusing it. Palmes v. State, 397 So.2d 648 (Fla. 1981). See also Dudley v. State, 405 So.2d 304 (Fla. 4th DCA 1981), which requires a defense to be legally cognizable.
As to the substitute judgment instruction, appellant relies solely upon the case of John F. Kennedy Memorial Hospital, Inc. v. Bludworth, 452 So.2d 921 (Fla. 1984), for the proposition that the trial court erred in refusing that particular request.
The following certified question was the issue of that case:
In the case of a comatose and terminally ill individual who has executed a so-called "living" or "mercy" will, is it necessary that a court appointed guardian of his person obtain the approval of a court of competent jurisdiction before terminating extraordinary life support systems in order for consenting family members, the attending physicians, and the hospital and its administrators to be relieved of civil and criminal liability?
This question was answered in the negative. The supreme court stated, "To be relieved of potential civil and criminal liability, guardians, consenting family members, *1191 physicians, hospitals, or their administrators need only act in good faith."
Appellant attempts to fashion an argument from this case by claiming first that Emily left a "mercy will" and second that appellant acted in "good faith."
The following facts explain the condition of Mr. Landy (the subject of John F. Kennedy Memorial Hospital, Inc. v. Bludworth, supra) and the nature of the "mercy will" he left. They are presented here to demonstrate the dramatic contrast between John F. Kennedy Memorial Hospital, Inc. v. Bludworth, supra, and the case at hand.
Francis B. Landy was admitted to John F. Kennedy Memorial Hospital in April 1981. He was terminally ill, and within two days he stopped breathing and was placed on a mechanical ventilator. He had suffered permanent brain damage and was held on the threshold of death through the use of extraordinary artificial means developed by modern medical technology. He was unable to breathe for himself and was unable to think and to give a response. A tube was placed in his trachea, and an artificial support system breathed for Mr. Landy. When placed on the ventilator, Mr. Landy was suffering from acute respiratory failure, chronic interstitial fibrosis and gastrointestinal bleeding. Over the next several days after having been placed on the mechanical ventilator, it became obvious to his doctor that, because of his neurological function and his respiratory function, it was impossible to wean him from the ventilator. His mental status continued to deteriorate. Mr. Landy's doctor diagnosed his condition as terminal.
As the supreme court put it, Mr. Landy was "on the threshold of death."
Mrs. Landy delivered to the treating doctor a written document entitled "Mercy Will and Last Testament" that had been signed by Mr. Landy and two witnesses on April 16, 1975. As recently as February 1981, Mrs. Landy had promised her husband that if he were hospitalized she would make this document a part of his hospital record. Among other things, it stated that Mr. Landy did not wish to be kept alive through the use of extraordinary life support equipment such as a respirator.
In the case at hand there was no evidence that Emily left a mercy will. It is ridiculous and dangerous to suggest, as appellant does, that a constructive mercy will was left when Emily (or anyone else who is sick) said/says, "I'm so sick I want to die." Such a holding would judicially sanction open season on people who, although sick, are also chronic complainers.
Because there was no mercy will, appellant's good faith intentions do not come into play. "Good faith" is not a legal defense to first degree murder.
Thus, we hold that no error has been demonstrated by the refusal of the requested instruction on euthanasia, substituted judgment or mercy wills.
Point 3. Appellant claims that reversible error was committed by an inadvertent mistake which resulted in the giving of an inapplicable instruction. We disagree.
Appellant did testify. The jury was correctly instructed:
The defendant in this case has become a witness. You should apply the same rules to consideration of his testimony that you apply to the testimony of the other witnesses.
Appellant claims that the following instruction was inadvertently included in the written instructions furnished to the jury:
DEFENDANT NOT TESTIFYING
The defendant exercised a fundamental right by choosing not to be a witness in this case. You must not view this as an admission of guilt or be influenced in any way by his decision. No juror should ever be concerned that the defendant did nor did not take the witness stand to give testimony in the case.
First, it was not established that the complained-of charge was indeed furnished *1192 to the jury. Second, even if it is assumed that the charge was accidentally included, we are not at all persuaded that the jury was confused or misled since the jury saw and heard appellant give extensive testimony and since the jury was correctly instructed orally and in writing as to the applicable rules where a defendant does testify. No error has been demonstrated on this point.
Point 4. We hold that no error or abuse of discretion was committed in allowing photographs of the deceased into evidence inasmuch as the photographs were relevant and helpful to the medical examiner in explaining his testimony to the jury. State v. Wright, 265 So.2d 361 (Fla. 1972); Bauldree v. State, 284 So.2d 196 (Fla. 1973); Foster v. State, 369 So.2d 928 (Fla. 1979); Wilson v. State, 436 So.2d 908 (Fla. 1983); Henderson v. State, 463 So.2d 196, 200 (Fla. 1985).
Finally, this court notices that this aged defendant has been a peaceful, lawabiding and respected citizen up until this time. No one has suggested that he will again kill someone or enter upon a criminal career. However, the absolute rigidity of the statutory mandatory minimum sentences do not permit consideration of these factors or, for that matter, they, different from the sentencing guidelines, do not take into account any mitigating circumstances. Whether such sentences should somehow be moderated so as to allow a modicum of discretion and whether they should allow distinctions to be made in sentencing between different kinds of wrongdoers, for instance, between a hired gangster killer and one, however misguided, who kills for love or mercy, are all questions which, under our system, must be decided by the legislature and not by the judicial branch. We leave it there.
Having completely considered the written and oral appellate presentation, the judgment of conviction is
AFFIRMED.
OWEN, WILLIAM C., Jr., Associate Judge, concurs.
GLICKSTEIN, J., concurs specially with opinion.
GLICKSTEIN, Judge, concurring specially.
I agree in general with the reasoning of the majority, and entirely concur in the result.
Were this not a cause celebre, the opinion might well have read simply, "PER CURIAM AFFIRMED," for none of the appellant's contentions have merit. However, since the opinion contains detailed analysis, I think it is essential to add to the discussion of appellant's Point 2 the following:
Even if there had been a mercy will, and even if appellant could show good faith intentions, we cannot equate his pulling the trigger of a gun held at his wife's head with the removal, as in John F. Kennedy Memorial Hospital, Inc. v. Bludworth, of extraordinary life support systems from a terminally ill patient. The object of the former is to end a life; the latter, to let nature take its course.
I have some concern, also, about the hint in the main opinion that trial courts should be enabled to vary minimum mandatory sentences according to the "kind" of wrongdoer; e.g., hired killer versus misguided mercy killer. I do not favor opening the door to such distinctions.
My thoughts lie with the victim, who was silenced forever by appellant's criminal act. She would be no more dead if a hired gangland killer had pulled the trigger.
Can it be that we feel more comfortable about imposing severe punishment on persons we perceive to belong to a separate tribe, whom we label criminals, than on those we see as members of our own tribe? In fact, we are all members of a common humanity.
The Decalogue states categorically, "Thou shalt not murder." It draws no distinction between murder by members of the middle class and murder by members *1193 of an underclass. It draws no distinction between murder by a family member and murder by a stranger. It draws no distinction between murder out of a misguided notion of compassion and murder for hire.
The victims in all such cases are equally dead. If the act was deliberate, the minimum penalty should not vary with the actor's purported motivation.
The concept of permissive mitigation of the minimum penalty based upon a claim the motive for the killing was compassion is even more difficult to accept when the offender is sophisticated, educated and mature, and has enjoyed opportunities in life to make choices.
NOTES
[1] Section 782.04(1)(a)1, Florida Statutes (1981), provides:

782.04 Murder 
(1)(a) The unlawful killing of a human being:
1. When perpetrated from a premeditated design to effect the death of the person killed or any human being ...
....
is murder in the first degree and constitutes a capital felony, punishable as provided in s. 775.082.