**In re CONSERVATORSHIP OF Holly Ann FOSTER.**

Nos. C4–95–118, C6–95–119.

Supreme Court of Minnesota.

April 26, 1996.

Gail Rising, Minneapolis; Anita Vander-Horck, Plymouth, for appellant.

Hubert H. Humphrey, III, Attorney General, Paul M. Landskroener, Asst. Attorney General, St. Paul; Michael O. Freeman, Hennepin County Attorney, Jay Arneson, Asst. Hennepin County Attorney, Minneapolis, for respondent.

James M. Crist, Minneapolis, for Amicus Curiae Minnesota Association of Guardianships and Conservatorships.

Barbara J. Blumer, Eagan, for amicus curiae Minnesota Association of Nursing Home Medical Directors and Physicians.

Henry Helgen, Minneapolis, for amicus curiae Care Providers of Minnesota.

OPINION

STRINGER, Justice.

Here, we determine whether a public conservator with the power to consent to necessary medical care on behalf of a conservatee may, without additional court approval, consent to treatment with neuroleptic medication. Appellant Holly Ann Foster is a 39-year–old woman with severe mental and physical disabilities. In March of 1994, the Hennepin County Bureau of Social Services filed a motion to appoint the Commissioner of Human Services (commissioner) as public conservator of Foster. The district court appointed the commissioner as public conservator and granted all powers sought in the petition, including the power to consent to necessary medical care, but denied the commissioner the power to consent to neuroleptic medication determining that there was insufficient evidence that Foster was incompetent to give informed consent to treatment with neuroleptic medication and that the use of neuroleptic medication was in her best interests. The court concluded that granting to the conservator the authority to consent without additional evidence of Foster's incompetence adduced at a subsequent hearing would infringe Foster's constitutional due process rights. On appeal, the court of appeals reversed, concluding that comprehensive procedural safeguards in the statutes and administrative rules adequately protect the constitutional rights of individuals under a public conservatorship and that consent to general medical care includes consent to treatment with neuroleptic medication without additional court approval. We affirm.

Holly Ann Foster suffers from mental retardation, mental illness, and physical disabilities. She lives in a community-based group home with three other developmentally disabled adults in Bloomington, Minnesota, and is employed by Lutheran Brotherhood in the mail room. Her primary disability is mental retardation in the moderate to severe range. In addition, Foster has schizo affective disorder, a major mental illness similar to schizophrenia, and is legally blind. She started taking neuroleptic medication to control hallucinations, which at times rendered her quite violent. Since she began taking Haldol, a neuroleptic medication, her hallucinations have been almost nonexistent. Foster was subsequently switched to Navane (thiothixene), a different neuroleptic medication. According to Foster's case manager, if Foster were abruptly removed from the neuroleptic medication, behavioral symptoms would escalate and recur, including verbal and physical threats, aggressive behavior, hallucinations, and delusional thinking.

Neuroleptic medications [1] are widely used to control the symptoms of mental illness. The use of neuroleptic medication carries a significant risk of side effects, however, and permanent or long-lasting psychological or neurological damage may occur. This court has previously noted the possibility of at least some temporary side effects associated with the use of neuroleptic medications. *Jarvis v. Levine*, 418 N.W.2d 139, 145 (Minn. 1988). The *Jarvis* court also noted that on rare occasions, "serious non-muscular side effects, such as skin rashes, ocular changes, cardiovascular changes, and sudden death" have occurred. *Id.* at 146. A "more serious concern" identified by the *Jarvis* court is the possibility of the patient developing tardive dyskinesia, a permanent and irreversible neurological condition characterized by "involuntary muscle movements such as chewing, blowing, or licking motions, but may also involve involuntary movement of other areas of the body." *Id.*

Although Foster had never had a court-appointed guardian or conservator, she has received around-the-clock supervision under the management of the county social services department. Her case manager arranges and approves almost every aspect of her life, including her physician, her psychiatrist, her psychologist, and her physical therapist, as well as her residence, her employment, her financial resources, and her social and recreational activities. Foster's ability to think abstractly and problem solve is severely restricted, and she needs assistance in processing information; however, she does have limited decision-making ability. For example, she makes choices in what she would like to

---

1. In medical literature, the terms "neuroleptic," "antipsychotic," and "major tranquilizer" are of-
ten used interchangeably. *Jarvis v. Levine*, 418 N.W.2d 139, 140 n. 1 (Minn.1988).

purchase when shopping, needs "just minor help" from staff in planning activities, is very social and has a boyfriend, has expressed an interest in moving home with her mother, and participated in a decision to switch psychiatrists.

In late 1993 and early 1994, Foster's case manager met with Foster's mother to discuss the need to establish a conservatorship.[2] Neither Foster's mother nor her sister was willing to become her conservator, and her mother requested that the commissioner assume the responsibility. On March 21, 1994, a program manager with the Hennepin County Bureau of Social Services petitioned the district court to appoint the commissioner as Foster's public conservator. The petition alleged that Foster was incapable of exercising certain powers over her personal affairs, including consenting to medical care, and requested that the commissioner be given the power to make decisions in those areas. Aware that the district court in other cases had required that certain procedures be followed before the court would grant the specific power to consent to neuroleptic medication, even if the general power to consent to necessary medical care was granted, the commissioner filed a motion to clarify that neuroleptic medication was a form of medical treatment for which the commissioner sought power to consent on Foster's behalf.

At an evidentiary hearing, the only witness to testify was Vicky Stanton, Foster's case manager and proposed conservator.[3] Stanton testified that Foster was not capable of giving informed consent for her own medical care, including treatment with neuroleptic medication, and that she was not capable of discussing with her physician whether a particular medication should be discontinued or the dosage changed, nor could she understand specifically the risks and benefits of neuroleptic medication. Stanton further testified that should she act as Foster's conservator, she would comply with Minn. R. 9525.3050 (1995), which regulates a public conservator's power to consent to treatment with neuroleptic medication.

The district court appointed the commissioner as public conservator for Foster.[4] Finding that Foster was incapable of exercising the power to consent to necessary medical or other professional care or treatment, the court granted the commissioner the general power to consent to necessary medical care. The court also found that there was insufficient evidence to show that neuroleptic medication was in Foster's best interests or that Foster was incompetent to give informed consent to treatment with neuroleptic medication and, therefore, withheld the power of the conservator to consent to neuroleptic medication for Foster without further order of the court.

The court of appeals reversed, concluding that when a public conservator is granted the power to consent to necessary medical care on behalf of a conservatee, no further court approval is necessary for the public conservator to consent to treatment with neuroleptic medication on behalf of the conservatee. The court also concluded that the safeguards in applicable statutes regarding appointment of a public conservator and in administrative rules regarding a public conservator's authority to consent to neuroleptic medication are sufficient to protect the conservatee's constitutional rights. We agree with this analysis.

 The district court has broad statutory authority in appointing a conservator. *In re Guardianship of Stanger*, 299 Minn. 213, 215, 217 N.W.2d 754, 755 (1974). A reviewing court will not interfere with the district court's decision absent an abuse of discretion. *Id.* Construction of statutes and

---

2. A public guardian exercises all of those powers designated in Minn.Stat. § 525.56 (1994) for the care of an incapacitated person (e.g., duties regarding shelter, nutrition, medical care, personal property, habilitation, rehabilitation, social and recreational contacts, training, and education), while a conservator exercises only some of those powers, as designated by the court. Minn.Stat. § 525.539, subds. 2 & 3 (1994) (defining "guardian" and "conservator").

3. Although the commissioner is named in the petition as public conservator, the power is delegated to the local county of guardianship responsibility and from there to a case manager or case worker who is responsible for carrying out the day-to-day duties. *See* Minn. R. 9525.3010 (1995).

4. Five petitions were consolidated for consideration by the district court, but only the decision in Foster's case is before this court.

constitutional provisions, however, is a question of law, and this court owes no deference to a lower court's conclusions. *In re Blilie,* 494 N.W.2d 877, 881 (Minn.1993). A statute bears the presumption of validity, and the "party challenging the constitutionality of the statute has the onus of establishing beyond a reasonable doubt that the statute violates a claimed right." *In re Schmidt,* 443 N.W.2d 824, 826 (Minn.1989). A trial court's rulings on mixed questions of fact and law will be independently reviewed. *Meyering v. Wessels,* 383 N.W.2d 670, 672 (Minn.1986).

 Foster alleges that the statutory and administrative procedures fail to adequately protect her from being deprived of her fundamental right to privacy and bodily integrity without due process of law. When considering a procedural due process challenge, the reviewing court applies the three-part balancing test set forth in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *Heddan v. Dirkswager,* 336 N.W.2d 54, 59 (Minn.1983) (adopting the *Mathews* analysis). Under this test, we determine whether the process adequately balances: (1) the private interest affected by the government's action; (2) the risk that the process provided will result in an erroneous deprivation of the private interest and the probable value of additional or substitute procedural safeguards; and (3) the state's interest in the procedures provided, including the administrative burden and expense the additional procedures sought would require. *Id.*

 First, as to the private interest affected by the government's action, the right to be free from intrusive medical treatment is a fundamental right encompassed by the right of privacy under the Minnesota Constitution. *Jarvis v. Levine,* 418 N.W.2d 139, 148 (Minn.1988). In determining whether intrusive mental health treatment may be administered without judicial approval against a patient or guardian's objection, the state's interest in making treatment decisions for a mentally ill person who is incompetent to make those decisions is balanced against the individual's constitutionally protected privacy interest. *Price v. Sheppard,* 307 Minn. 250, 258, 239 N.W.2d 905, 911 (1976). The state, acting as *parens patriae,* can make decisions regarding mental health treatment on behalf of one who is incompetent to make the decision on his or her own behalf, but the extent of the state's intrusion is limited to reasonable and necessary treatment. *Id.* at 259–60, 239 N.W.2d at 911. We have determined that psychosurgery, electroconvulsive therapy, and neuroleptic medication are all sufficiently intrusive so as to require a hearing before they can be administered in the absence of the consent of the party to whom the treatment is to be administered or the consent of the party's guardian.[5] *Id.* at 262, 239 N.W.2d at 912–13 (concluding that psychosurgery and electroconvulsive therapy are intrusive forms of mental health treatment); *Jarvis,* 418 N.W.2d at 146 (concluding that neuroleptic medication constitutes intrusive treatment). Accordingly, the statutory and administrative procedures must ensure a high degree of reliability that the treatment is necessary, appropriate, safe, and the least intrusive alternative available.

Balanced against the private interest affected by the state's action is the risk that the process provided will result in an erroneous deprivation of the private interest at stake. A public conservator's authority to consent to the use of neuroleptic medication is governed by statutory procedures contained in the Public Guardianship for Adults with Mental Retardation Act, Minn.Stat. ch. 252A (1994); certain sections of the general guardianship statute, Minn.Stat. §§ 525.539–.56 (1994); and Minn. R. 9525.3050. Under Minnesota Statutes chapter 252A, a party seeking appointment as a public conservator must set forth in a petition "the powers [that] the petitioner believes are necessary to protect and supervise the proposed conservatee." Minn.Stat. § 252A.06, subd. 2(7) (1994). A comprehensive evaluation must also be filed with the court detailing the individual's health status, physical condition,

5. The hearing procedures to be followed include: (1) a petition for an order authorizing the prescribed treatment; (2) the appointment of a guardian ad litem to represent the interests of the patient; and (3) an evidentiary hearing at which the court shall determine the reasonableness and necessity of the prescribed treatment. *Id.* at 262, 239 N.W.2d at 913.

intellectual capacity, functional abilities, and need for social services. Minn.Stat. § 252A.07 (1994); Minn.Stat. § 252A.02, subd. 12 (1994) (defining comprehensive evaluation). The proposed conservatee has the right to appointed counsel and an evidentiary hearing at which there is a legal presumption of capacity and the burden of proof is on the petitioner. Minn.Stat. § 252A.09 (1994); Minn.Stat. § 252A.101, subd. 1 (1994); Minn. Stat. § 525.551, subd. 3 (1994). The standard of proof is that of clear and convincing evidence. Minn.Stat. § 525.551, subd. 3. The court is required to grant only those powers that the proposed conservatee is incapable of exercising on his or her own behalf. Minn.Stat. § 252A.101, subd. 5(b) (1994); Minn.Stat. § 525.56, subd. 2 (1994).

The court is specifically authorized to grant the conservator the power to consent to necessary medical care or other professional care and treatment on behalf of the conservatee. Minn.Stat. § 525.56, subd. 3(4)(a) (1994). For psychosurgery, electroshock, sterilization, or experimental treatment, however, specific prior court approval is required. *Id.* The procedure for these types of treatment protocols includes notice, the right to counsel, and a determination of the best interests of the conservatee. Minn. Stat. § 525.56. subd. 3(4)(b). In making its determination, the court must take into account a written medical report that specifically considers the medical risks of the procedure; "whether alternative, less restrictive *methods of treatment could be used to protect the best interests of the [ ]conservatee;"* and, in the case of a public conservatee, the recommendation of the commissioner. *Id.* "The standard of proof is that of clear and convincing evidence." *Id.*

*While the legislature did not require prior court approval for a public conservator to* consent to neuroleptic medication,[6] it did direct the commissioner to adopt rules to implement chapter 252A, specifically including standards for performance of conservatorship duties and the use of neuroleptic medication.[7] Minn.Stat. § 252A.21, subd. 2 (1994). Under the administrative rules, the county staff acting as public conservator has express authority to give informed consent for the use of neuroleptic medication for the conservatee. Minn. R. 9525.3050, subpt. 1. The following information must be documented and reviewed, however, before consent to the use of neuroleptic medication may be given:

A. the target behavior or condition for which the psychotropic medication is to be used;

B. a description of the target behavior or condition in specific observable and measurable terms;

C. the current rate, intensity, and quantification of the target behavior or condition;

D. the expected benefits including the level to which the psychotropic medication is to change the target behavior or condition;

E. the other therapies and programs available and which have been considered, or tried and rejected, and the rationale for selecting psychotropic medications as opposed to alternative therapies or programs; and

F. specific information about the psychotropic medication to be used including:

(1) the generic and commonly known brand name;

(2) the proposed dose;

(3) the possible dosage range or maximum dosage;

(4) the route of administration;

---

6. The statute does provide that a conservator who acts within the scope of his or her authority is not criminally or civilly liable for the provision of any necessary medical care including, but not limited to, the administration of psychotropic medication to which the conservator has consented. Minn.Stat. § 525.56, subd. 3(4)(e) (1994).

7. The statute and the rule refer to "psychotropic medication," which is defined to include neuroleptic medication. Minn.Stat. § 252A.21, subd. 2 (1994); Minn. R. 9525.3050; Minn. R. 9525.3015, subpt. 24(A).

(5) the estimated duration of therapy; and

(6) the risks and possible side effects of the psychotropic medication, including the manner in which the side effects may be managed.

Minn. R. 9525.3050, subpt. 2 (1995).

Additionally, before a public conservator may consent to the use of neuroleptic medication, standardized methods for assessing and monitoring side effects, monitoring schedules, and a method to collect and review data must all be in place. *Id.*, subpts. 3–5. The rule specifies the minimum intervals at which monitoring and data review are to take place. *Id.*, subpts. 3, 4. Consent to the use of neuroleptic medication must be withdrawn at any time that the use of neuroleptic medication does not appear to be in the best interests of the conservatee and automatically expires one year from the date of consent unless renewed or a shorter time is agreed upon. *Id.*, subpts. 1, 2. The public conservator also consults regularly with the conservatee's service planning team consisting of the case manager, the conservatee, the conservator, and a qualified mental retardation professional, to develop an individual service plan. Minn. R. 9525.0004, subpt. 24 and 9525.0024 (1995). Further, the commissioner, conservatee, or any interested person may petition the court to review *de novo* any decision of a public conservator on behalf of the conservatee. Minn.Stat. § 252A.19, subd. 2 (1994); *see also* Minn. R. 9525.3100 (1995) (providing for both informal review by the department and *de novo* review by the court).

The balance of personal rights and risks of inappropriate treatment required in the *Mathews* analysis requires us also to consider the probable value of additional procedural safeguards. *Heddan*, 336 N.W.2d at 59 (citing *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903). The district court imposed the following additional procedural safeguards before it would approve treatment with neuroleptic medication: specific proof that the individual is incompetent to give informed consent on her own behalf to treatment with neuroleptic medication; prior court approval of treatment with neuroleptic medication; a six-page form completed by the prescribing physician supporting the use of neuroleptic medication; and a six-page form completed by an independent non-treating multidisciplinary treatment review panel. Then, if the court determines that the conservatee is incompetent to consent to treatment with neuroleptic medication and that neuroleptic medication is in the conservatee's best interests, the conservator may give written informed consent for a specific period of time not to exceed one year on the conditions that: (1) the independent non-treating multidisciplinary treatment review panel gives written approval to the use of neuroleptic medications; and (2) the incompetent person does not object to or reject the therapy.

Although the district court found Foster incapable of giving her own informed consent to necessary medical care and treatment, it required additional proof that she is incapable of consenting to neuroleptic medication. The Public Guardianship for Adults with Mental Retardation Act provides:

An appointment of the commissioner as conservator shall not constitute a judicial finding that the mentally retarded person is legally incompetent except for the restrictions which the conservatorship places on the conservatee.

Minn.Stat. § 252A.12 (1994). Accordingly, when a conservatee is found by clear and convincing evidence to be incapable of exercising the power to consent to necessary medical care and treatment, as the district court did here, and the public conservator is granted the power to consent to necessary medical care and treatment, it stands to reason that the conservatee is deemed legally incompetent to consent to necessary medical care and treatment. We find little additional value in requiring a separate showing that she is also incompetent to consent to neuroleptic medication. Therefore, we conclude that consent to necessary medical care and treatment encompasses consent to treatment with neuroleptic medication.

We next inquire as to whether further court approval before a public conservator may consent to the use of neuroleptic medication would provide value in the balancing test under *Mathews*. The legislature has

provided that safeguards for the use of neuroleptic medication be set out by administrative rule, which expressly allows the public conservator to consent to the use of neuroleptic medication without prior court approval. Minn.Stat. § 252A.21, subd. 2; Minn. R. 9525.3050, subpt. 1. The district court misread our opinion in *Jarvis,* however, when it cited *Jarvis* as authority for the need for prior judicial review before neuroleptic medication may be administered. In *Jarvis,* our ruling that court approval must be obtained before intrusive forms of mental health therapy could be administered without prior court approval was in the context of a nonconsenting patient. 418 N.W.2d at 144. That is quite different from what we have here, where Foster has not refused to take neuroleptic medication, and the public conservator has given consent to the use of neuroleptic medication on behalf of Foster.[8] Further, we have affirmed the constitutionality of administering neuroleptic medication to an incompetent patient under the civil commitment act without prior court approval if: (a) the patient does not object to or refuse treatment; (b) a guardian gives written, informed consent; and (c) a multidisciplinary treatment review panel composed of persons who are not involved in giving direct care to the patient gives written approval. *In re Schmidt,* 443 N.W.2d 824, 825 n. 2, 827–28 (Minn.1989); *see also In re Blilie,* 494 N.W.2d 877, 883 (Minn.1993); Minn.Stat. § 253B.03, subd. 6c (1994).

The district court also concluded that additional protective procedures were necessary because the statutory and administrative provisions in place fail to provide adequate constitutional protection where a conservator does not have to obtain prior court approval before consenting to the use of neuroleptic medication, even though prior court approval is required for electroshock therapy and psychosurgery by statute. Minn.Stat. § 525.56, subd. 3(4)(a) and (b) (1994). Although this court has found the use of neuroleptic medication to be intrusive therapy, placing it in the same category as psychosurgery and electroshock therapy, we have also recognized that varying degrees of intrusiveness exist within that category, stating that electroshock therapy is "one of the most intrusive forms of treatment" and that treatment techniques can "range in degree of severity and coerciveness from the least intrusive forms such as milieu therapy * * * and psychoanalysis, to drug, aversion, or electroconvulsive therapy, and ultimately to psychosurgery." *Jarvis,* 418 N.W.2d at 144–45 (quoting *Price,* 307 Minn. at 260, 239 N.W.2d at 911, 912). Psychosurgery and electroshock therapy are sufficiently different from neuroleptic medication to rationalize the distinction in the statutory procedures regarding consent. Given the extensive review and approval process now in place to assure the appropriateness of administering neuroleptic medication, the risk of injury to the patient or third parties in delaying administration of the medication because further court approval is required hardly seems justified. This is particularly true here, where the information on which the public conservator bases her consent to treatment with neuroleptic medication parallels and in some cases exceeds the information required by the district court under its procedures.

Foster further maintains that the participation of an impartial decision-maker, independent of governmental staff, is needed to assure her due process rights. Under the current statutory and administrative scheme, conservators may consent to treatment with neuroleptic medication without court approval or approval of an independent treatment review panel. While we have noted that "a patient's right to privacy might conceivably be violated if the treatment decision rested solely upon the unfettered discretion of the commissioner or the commissioner's surrogates," our primary concern has been "that intrusive therapy should not be authorized by persons engaged in providing direct care to a

8. On February 5, 1995, the court of appeals granted the commissioner's motion to remove the automatic stay imposed by Minn.Stat. § 525.714 (1994) and grant the commissioner the power to consent to neuroleptic medication on Foster's behalf pending resolution of the appeal. Foster did not oppose the commissioner's motion.

patient." *In re Blilie,* 494 N.W.2d at 883; *see also Schmidt,* 443 N.W.2d at 827 (noting concern that patients be protected "from the exercise of sole unrestrained discretion of the medical personnel at our state hospitals"). These concerns are not implicated in this case because Foster lives in a private treatment facility and is monitored by independent professionals. The commissioner is not engaged in providing direct care to the conservatee and must abide by extensive regulations governing her authority to give consent to neuroleptic medication on behalf of a conservatee. Further, the administrative rules provide for team review of the conservatee's individual service needs on a regular basis. Minn. R. 9525.0004–.0036 (1995). Accordingly, independent evaluation of treatment with neuroleptic medication by either a court or by a treatment review panel does not afford significant additional protection.

We therefore conclude that the additional procedural safeguards imposed by the trial court provide little additional value and are largely duplicative of a comprehensive statutory and administrative system that fairly, efficiently, and effectively safeguards the rights of the conservatee. Next, under the *Mathews* analysis, we balance the state's interest in the procedures provided, including the administrative burden and expense the additional procedures would require. Respondents assert that the commissioner has "a legitimate interest in not being required to re-do, in a different, elaborate format, what statutes and rules already require—with the inherent delay and expense the additional procedures require and with no evidence that the conservatee will be better protected." We agree. As we noted above, the comprehensive statutory and administrative procedural safeguards already in place ensure a high degree of reliability.

Finally, Foster argues that even if the additional procedures imposed by the district court are not constitutionally required in all cases, the district court had the inherent discretionary authority to require specific proof regarding competency to consent to neuroleptic medication and the best interests of Foster before granting her conservator the authority to consent to neuro-leptic medication. While indeed a probate court has broad discretion in appointing a conservator, its discretion is not unlimited. Where there is no dispute that the commissioner or her designee is competent to exercise responsibly the power to consent to neuroleptic medication, the court has made a finding that Foster is incapable of exercising the power to consent to necessary medical care and treatment on her behalf, and Foster has never disputed that she needs treatment with neuroleptic medication nor has she objected to it, we believe that the trial court went beyond the exercise of reasonable discretion in imposing additional requirements as a prerequisite to approval.

Foster also seeks review of the court of appeals' decision refusing to strike portions of the briefs submitted by amici curiae, the Minnesota Association for Guardianship and Conservatorship and the Minnesota Association for Nursing Home Medical Directors and Physicians. The court of appeals did not appear to rely on this information, and we do not rely on it in reaching our decision.

*Affirmed.*