**In re the GUARDIANSHIP OF Jeffers J. TSCHUMY, Ward.**

**No. A12–2179.**

Court of Appeals of Minnesota.

July 29, 2013.

Lori Swanson, Attorney General, Nathan Brennaman, Mikiesha R. Mayes, Assistant Attorneys General, St. Paul, MN, for amicus curiae State of Minnesota.

Robert A. McLeod, Karla M. Vehrs, Lindsey Middlecamp, Lindquist & Vennum, L.L.P., and Charles W. Singer, Minneapolis, MN, for appellant Joseph Vogel, guardian and conservator of Jeffers J. Tschumy.

Michael J. Biglow, Law Offices of Michael J. Biglow, Minneapolis, MN, for respondent-ward Jeffers J. Tschumy.

Rebecca Egge Moos, Rachel B. Peterson, Charles E. Lundberg, Bassford Remele, P.A., Minneapolis, MN, for respondent Allina Health System.

Diane B. Bratvold, Jennifer A. Lammers, Amie E. Penny Sayler, Briggs & Morgan, P.A., Minneapolis, MN; and Benjamin Peltier, Minnesota Hospital Association, St. Paul, MN; and Teresa Knoedler, Minnesota Medical Association, Minneapolis, MN, for amici curiae Minnesota Hospital Association and Minnesota Medical Association.

Considered and decided by HUDSON, Presiding Judge; STAUBER, Judge; and TOUSSAINT, Judge.*

## OPINION

HUDSON, Judge.

Appellant guardian challenges the district court's determination that he was required to seek an order from the district court to authorize the discontinuation of a permanently unconscious ward's life-sup-

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

766

port systems. Because the statutory grant of medical-consent power to a guardian, unless otherwise limited by court order, encompasses the authority to discontinue medical treatment for a permanently unconscious ward, we conclude that, if no interested party has objected, a guardian holding that power need not seek an order from the district court before authorizing disconnection of the ward's life-support systems.

## FACTS

In April 2008, the district court issued an order placing respondent Jeffers J. Tschumy under general guardianship. Tschumy, who resided in a nursing facility, was 53 years old, unmarried, and without children. He suffered from mental health impairments, diabetes, effects from a stroke, and partial paralysis from a spinal infection. An evaluation of his mental ability showed that he functioned within the average to moderately-impaired range and that he would need assistance with his health care, housing, transportation, food, and finances. His behavior at the nursing facility was consistent with this evaluation. The district court found that Tschumy was incapacitated and appointed Tschumy's then-conservator as general guardian.

In 2008 and 2009, Tschumy's condition remained stable. In October 2009, the district court removed the original guardian and appointed appellant Joseph Vogel, a professional guardian, as successor guardian. The successor guardianship order and letters provided that, among other powers, the guardian had the power provided in Minn.Stat. § 524.5–313(c)(4) (2008) to "[g]ive any necessary consent to enable, or to withhold consent for, [Tschumy] to receive necessary medical or other professional care, counsel, treatment, or service."

On April 15, 2012, while living in a group home, Tschumy suffered respiratory and cardiac arrest after choking on food. Although he survived, he suffered severe and irreversible brain injury and became deeply comatose. Tschumy was placed on a medical ventilator, medication to lessen seizure activity, and intravenous fluids. He also received intravenous nutrition.

Tschumy did not have a health care directive, and the guardian was unable to locate any family members or friends who might have knowledge or information regarding Tschumy's preferences about end-of-life decisions or whether he had ever expressed any religious or moral beliefs regarding those decisions. When the guardian had previously raised this topic with Tschumy, he stated that he did not wish to discuss it.

On April 23, 2012, respondent Allina Health System, d/b/a Abbott Northwestern Hospital, where Tschumy was hospitalized, filed a motion to clarify and, if necessary, to amend the successor letters of general guardianship to specifically authorize the guardian to direct removal of Tschumy's life-support systems. In support of the motion, an Allina physician alleged that Tschumy suffered from medical conditions that had brought him close to the end of his life; that further medical intervention would be futile and, in fact, harmful; and that, in line with good medical practice and ethical obligations, the life-support systems should be removed. A hospital ethics-committee consultation determined that no benefit could be achieved with further intensive treatment. The guardian agreed, but took the position that Allina's motion was unnecessary because the 2009 successor guardianship order and letters already authorized him to direct removal of Tschumy's life-support systems.

After an initial hearing, the district court issued orders appointing an attorney

to represent Tschumy and identifying the issues posed as (1) whether the medical power granted to a professional guardian permits the guardian to consent to life-support removal without court review or approval and (2) if court approval is necessary, whether Tschumy's life-support systems should be removed. At a second hearing, Tschumy's counsel indicated that he had reviewed Tschumy's medical records and an ethics-committee recommendation, had spoken to medical staff and the guardian, and visited Tschumy, who was unable to respond. Tschumy's counsel argued that, based on this information, including information on Tschumy's personal likes and dislikes, if Tschumy were able to communicate, he would wish to have life support removed and be allowed to die naturally. Counsel for Allina concurred, but also argued that, if there were disagreements about decisionmaking for a ward, an evidentiary hearing was required under the Minnesota Supreme Court's decision in *In re Guardianship of Torres,* 357 N.W.2d 332 (Minn.1984).

Vogel, as guardian, testified that he had attempted to discuss advanced directives with Tschumy before the injury, but Tschumy refused to do so. Vogel testified that he believed he had successor authority to authorize the withdrawal of life support, based on the court's 2009 order and guardianship letters, which gave him the power to make necessary medical decisions, which included declining medical treatment, if appropriate.[1] He expressed his opinion that Tschumy would not wish to remain in this ongoing medical state and that it would be in his best interests to have life-support systems terminated, even if that termination would result in death.

He testified that he formed this opinion based on conversations with Tschumy's doctor and his own observations over the last two and one-half years.

Another professional guardian testified that, absent a health care directive or other evidence, guardians have the right to make end-of-life decisions within the designated medical-consent power. On questioning by the district court, he agreed that some guardians may not be as careful as he in making those decisions and that there are a variety of reasonable views and opinions on end-of-life decisions. He testified that if he knew that a person or family believed that life was sacred and should be sustained as long as possible, even if medically futile, he would seek a decision from the court. He stated that he had proceeded in this manner on a few occasions when the family wanted to continue with life-support systems to keep the ward alive, but the hospital declined continued treatment.

Vogel's counsel argued that Vogel had authority to discontinue life-support systems, based on the general medical-consent power in Minn.Stat. § 525.5–313(c)(4)(i) and on the guardianship order, which specifically included consent to withdraw medical care. He argued that any limitation on a guardian's authority should be restricted to situations in which a controversy existed. Tschumy's counsel expressed concern about the lack of uniformity among guardians in carrying out a person's wishes, and argued that a guardian's decision to end a life was as important as other decisions for which the guardianship statutes expressly require a court order.

---

**1.** Although the guardianship order and letters in this case specifically gave the guardian the power "to withhold consent for the ward to receive necessary medical or other professional care," Vogel argues on appeal that, even absent this language, the general medical-consent power granted to a guardian authorizes a guardian to direct the disconnection of a ward's life-support systems.

The district court issued an initial order in May 2011 authorizing Allina and Vogel to discontinue Tschumy's life-support systems, concluding that it was in his best interests to be taken off of life support and allowed to die. Tschumy died shortly thereafter. Five months later, the district court issued a second order, concluding that, although Minn.Stat. § 524.5–313 (2012) grants broad power to guardians to consent to medical treatment on behalf of wards, it does not specifically grant guardians the power to terminate life support, and that, absent a valid health care directive, guardians must seek authorization from the district court to terminate life support. The guardian appealed the second order to this court. This court issued an order concluding that the appeal is timely, the guardian has standing to appeal, and the appeal is not moot because the issue presented is capable of repetition, yet likely to evade review, and involves an important public issue of statewide significance. The supreme court denied Vogel's petition for accelerated review.

## ISSUE

Did the district court err by concluding that a guardian who has the statutory power to consent to a ward's necessary medical treatment must seek a separate order from the district court to authorize the disconnection of the life-support systems of a permanently unconscious ward, even if no interested person has objected?

## ANALYSIS

This appeal requires us to interpret the Minnesota guardianship statutes, particularly Minn.Stat. § 525.5–313(c). We review de novo issues of statutory interpretation. *In re Conservatorship of Foster*, 547 N.W.2d 81, 84–85 (Minn.1996).

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2012). "If the meaning of a statute is unambiguous, we interpret the statute's text according to its plain language." *Brua v. Minn. Joint Underwriting Ass'n*, 778 N.W.2d 294, 300 (Minn.2010). In so doing, we apply the ordinary usage of words that are not technically used or statutorily defined, rely on accepted punctuation and syntax, and examine the statutory provision in its full-act context. *Occhino v. Grover*, 640 N.W.2d 357, 359 (Minn.App.2002), *review denied* (Minn. May 28, 2002); *see also In re Guardianship of Pates*, 823 N.W.2d 881, 888 (Minn.App.2012).

We construe statutes to give effect to all of their provisions and will not render any word, phrase, or sentence meaningless or superfluous. Minn.Stat. § 645.16; *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn.2000). We "interpret each section in light of the surrounding sections to avoid conflicting interpretations." *Schroedl*, 616 N.W.2d at 277. We do not give effect to plain meaning if it will produce a result that is unreasonable or at variance with the policy of the legislation as a whole. *Occhino*, 640 N.W.2d at 360. And if a statute is ambiguous, meaning that it is susceptible to more than one reasonable interpretation, we discern legislative intent by applying other canons of construction, including consideration of the necessity and purpose of the law, the objective to be attained, and the consequences of a particular interpretation. Minn.Stat. § 645.16(1), (4), (6); *Brua*, 778 N.W.2d at 300; *Schroedl*, 616 N.W.2d at 277–78. A court may also be guided by prior judicial efforts to interpret a statute. Minn.Stat. § 645.17(4) (2012); *Prior Lake Am. v. Mader*, 642 N.W.2d 729, 737 (Minn.2002).

The Minnesota guardianship statutes provide, in relevant part:

(c) The court may appoint a guardian if it determines that all the powers and duties listed in this section are needed to provide for the needs of the incapacitated person. The court may also appoint a guardian if it determines that a guardian is needed to provide for the needs of the incapacitated person through the exercise of some, but not all, of the powers and duties listed this section. *The duties and powers of a guardian or those which the court may grant to a guardian include, but are not limited to:*

. . . .

(4)(i) *the power to give any necessary consent to enable the ward to receive necessary medical or other professional care, counsel, treatment, or service,* except that no guardian may give consent for psychosurgery, electroshock, sterilization, or experimental treatment of any kind unless the procedure is first approved by order of the court as provided in this clause. The guardian shall not consent to any medical care for the ward which violates the known conscientious, religious, or moral belief of the ward.

Minn.Stat. § 524.5–313(c), (c)(4)(i) (emphasis added).

*District court decision*

Based on the supreme court's decision in *In re Guardianship of Torres,* as well as public-policy considerations, the district court concluded that the decision to disconnect life-support systems is not included in the medical-consent power given to a guardian under Minn.Stat. § 524.5–313(c)(4)(i). In *Torres,* which was decided in 1984, the supreme court held that the district court had both constitutional and statutory authority to empower a guardian (then denoted a conservator), to order the removal of a ward's life-support systems when the ward was in a permanently unconscious state. *Torres,* 357 N.W.2d at 339–40. The supreme court concluded that, although the specific portion of the statutes giving the conservator power to "give any necessary consent" to receive medical care, then Minn.Stat. § 525.56, subd. 3 (1982), might not encompass the right to authorize the removal of life support, such authority was contained in the broader catch-all provision, then Minn. Stat. § 525.56, subd. 3(4)(a). *Id.* at 337. This provision provided that the "duties and powers ... which the court may grant to a conservator ... include, but are not limited to" specifically described powers. *Id.* [2] The supreme court reasoned that

if the conservatee's best interests are no longer served by the maintenance of life supports, the probate court may empower the conservator to order their removal despite the absence of a specific provision ... which authorizes the court to do so. These same powers may be granted to a conservator by the court.

*Id.*

The district court in this case concluded that, under *Torres,* because it had not previously granted the guardian broad unspecified powers under Minn.Stat. § 524.5–313(c), but only the specified medical-consent power under Minn.Stat. § 524.5–313(c)(4)(i), the guardian was required to seek additional district court ap-

---

**2.** In 2003, the Minnesota legislature adopted the Uniform Guardianship and Protective Proceedings Act, which changed some aspects of the framework of Minnesota guardianship and conservatorship law. *See* 2003 Minn. Laws ch. 12; *see also* 6 Steven J. Kirsch, *Minnesota Practice* § 37.1 (Supp. 2010). But the provisions cited in *Torres,* although renumbered, remain in the current guardianship statute. *See* Minn.Stat. § 524.5–313(c), (c)(4)(i).

proval to authorize the disconnection of the ward's life-support systems. Appellant argues, however, that a guardian who has been granted the medical-consent power under section 524.5–313 is authorized to make that decision without routinely requesting permission from the district court. For reasons explained below, we agree.

By its plain language, Minn.Stat. § 524.5–313(c)(4)(i) grants a guardian "the power to give any necessary consent to enable the ward to receive necessary medical or other professional care." "Necessary" has been defined as "[u]navoidably determined by prior conditions and circumstances." *The American Heritage Dictionary of the English Language* 1207 (3d ed.1996). Thus, we conclude that, when a ward's medical condition has deteriorated to the point where his doctors and a medical ethics committee have concurred that a return to consciousness is extremely unlikely, "necessary" medical care, or care that has been "unavoidably determined by prior conditions and circumstances," may include the disconnection of the ward's life-support systems. *See* Minn.Stat. § 524.5–313(c)(4)(i).

The principle that "[e]xceptions expressed in a law shall be construed to exclude all others" also supports our holding. Minn.Stat. § 645.19 (2012); *see also In re S.L.J.*, 782 N.W.2d 549, 556 (Minn. 2010). The legislature has imposed limitations on a guardian's medical-consent power by providing specific exceptions to that power relating to a ward's sterilization, electroshock, psychosurgery, "or other experimental treatment." Minn.Stat. § 524.5–313(c)(4)(i).[3] With respect to these procedures, no guardian may give consent without prior approval from the district court. *Id.* The legislature's plain expression of the limitation on a guardian's medical-consent power in certain specified situations evinces legislative intent that other medical decisions remain subject to the guardian's medical-consent power. *See, e.g., In re Guardianship of Welch*, 686 N.W.2d 54, 56 (Minn.App.2004) (concluding that, because the administration of neuroleptic medication was not among listed medical exceptions for which a guardian could not provide consent, administration of that medication was included in the necessary medical care to which a guardian could consent).

A close reading of related statutory provisions also supports this result. The legislature has provided that "[i]f the court grants the guardian [medical-consent power] under section 524.5–313 ... the authority of a previously appointed health care agent to make health care decisions, as defined in Minn.Stat. § 145C.01, subdivision 5, is suspended until further order of the court or as otherwise provided." Minn.Stat. § 524.5–310(d) (2012). A "health care decision" is defined as "the consent, refusal of consent, or *withdrawal of consent* to health care." Minn.Stat. § 145C.01, subd. 5 (2012) (emphasis added); *see also* Minn.Stat. § 524.5–120(15) (2012) (stating that a ward may execute a health care directive "if the court has not granted a guardian any of the powers or duties under section 524.5–313, paragraph (c), clause (1), (2), or (4)"). Reading the medical-consent power under Minn.Stat. § 524.5–313(c)(4)(i) to encompass the guardian's authority to disconnect a ward's life-support systems is consistent with the statutory provision suspending the authority of a previously-appointed health care

---

**3.** In addition, by statute, a guardian may not, without district court approval, admit a ward to a regional treatment center, Minn.Stat. § 524.5–313(c)(1), or dispose of a ward's personal property if an interested party objects, Minn.Stat. § 524.5–313(c)(3).

agent to withdraw consent to health care when such a guardian is appointed. *See* Minn.Stat. § 145C.01, subd. 5; *see also In re Guardianship of L.W.,* 167 Wis.2d 53, 482 N.W.2d 60, 71 (1992) (concluding, based on similar statutory provisions, that "the clear indication is that a guardian has identical decisionmaking powers as a health care agent").

Respondent maintains that the plain language of the guardianship statutes supports the district court's analysis, noting that Minn.Stat. § 524.5–313(c) refers to "[t]he duties and powers of a guardian *or* those which the court may grant to a guardian . . . ." Minn.Stat. § 524.5–313(c) (emphasis added). Respondent argues that the word "or" inserted between the first and second clauses necessarily means that the district court first grants initial powers to a guardian, but then must separately grant a guardian authority to make a decision to discontinue life support, which, respondent asserts, is not included in the guardian's medical-consent power under Minn.Stat. § 524.5–313(c)(4)(i). We reject this argument. The cited portion of Minn.Stat. § 524.5–313(c) states only that the district court may either grant all listed powers and duties to a guardian, or some of those powers and duties. *Id.* The use of the disjunctive "or" does not, by itself, suggest a temporal difference between the district court's grant of initial powers to a guardian and a grant of the medical power to discontinue life support, nor does it preclude a statutory construction by which the initial grant of medical powers includes the power to terminate life support. *See, e.g., Schroedl,* 616 N.W.2d at 281 & n. 4 (explaining that the word "or" in a statute must be considered in context, and may be used "in the inclusive sense") (quotation omitted).

Respondent next argues that Minn.Stat. § 524.5–313(b), which states that "[t]he court shall grant to a guardian only those powers necessary to provide for the demonstrated needs of the ward," also supports the district court's reasoning that those powers are determined when the guardian is first appointed. Thus, respondent contends, a guardian who has initially been granted medical-consent powers must seek additional district court approval to later direct the disconnection of a ward's life-support system. But we decline to read into the plain language of the statute a provision that requires such approval as a second step after initial medical-consent powers have been granted. *See Metro. Sports Facilities Comm'n v. Cnty. of Hennepin,* 561 N.W.2d 513, 516–17 (Minn.1997) (stating that an appellate court will decline to read into a statute "a provision the legislature purposely omits or inadvertently overlooks") (quotation omitted).

Respondent additionally points out that, by statute, the ward retains control over aspects of life not delegated to the guardian, including the right to avoid medical treatment that would violate the ward's religious or moral beliefs. Minn.Stat. § 524.5–120 (2012). But this statute does not preclude a guardian who has been granted the medical-consent power from directing the disconnection of life-support systems from a permanently unconscious ward, if that action would not violate a ward's known moral or religious beliefs. *See* Minn.Stat. § 524.5–313(c)(4)(i).

Respondent also notes statutory language providing for the district court's jurisdiction over all guardianship powers. *See* Minn.Stat. § 524.5–313(a) (stating that "[a] guardian shall be subject to the control and direction of the court at all times and in all things"). But read in its whole-act context, this provision refers generally to the district court's jurisdiction over all guardianship matters, which includes monitoring the guardianship and entertaining a

petition by an interested person to terminate the guardianship. *See, e.g.,* Minn. Stat. § 524.5–316(a) (2012) (requiring guardian to submit annual reports to district court); Minn.Stat. § 524.5–312(a) (2012) (allowing district court to appoint a temporary substitute guardian); Minn. Stat. § 524.5–317(b) (2012) (allowing person interested in ward's welfare to petition the district court to terminate guardianship if ward no longer needs protection or assistance of guardian). It has no specific relevance here and thus is not dispositive of the narrow issue we must decide today.

*Application of In re Guardianship of Torres*

Our holding is not inconsistent with the supreme court's decision in *Torres.* First, *Torres* did not directly address the issue raised here—whether the statutory medical-consent power gives a guardian the authority to disconnect a ward's life-support systems. Further, the *Torres* court noted that the district court is bound to act in the ward's best interests and that the Minnesota legislature guaranteed a patient's right to refuse medical treatment in the Patient's Bill of Rights and prohibited a conservator from consenting to medical care that would violate the ward's known religious, conscientious, or moral beliefs. *Torres,* 357 N.W.2d at 338–39; *see* Minn. Stat. § 144.651, subd. 1 (2012) (permitting a guardian to seek enforcement of a patient's medical decisionmaking rights on behalf of that patient); Minn.Stat. § 524.5–313(c)(4)(i). Based on this authority, the supreme court observed that "simply equating the continued physical existence of a conservatee, who has no chance for recovery, with the conservatee's 'best interests' appears contrary not only to the weight of medical authority, but also to

those indications of legislative opinion which exist." *Torres,* 357 N.W.2d at 339. The supreme court noted that the district court's authority to order removal of life support relates closely to the ward's right to forego life-sustaining treatment, which had roots in the constitutional right to privacy and a common-law right to remain free from invasions of a person's bodily integrity. *Id.*

The *Torres* court observed that the right to forego life-sustaining treatment is not absolute and is balanced against state interests of preserving life, preventing suicide, protecting innocent third parties, and preserving the ethical integrity of the medical profession. *Id.* But the supreme court recognized that "[t]he individual's right of privacy may be overridden ... only if the state's interests are compelling." *Id.*[4] And the supreme court concluded that, although "under the facts in this case ... a court order was necessary," *id.* at 341, "[o]n an average about 10 life support systems are disconnected weekly in Minnesota. This follows consultation between the attending doctor and the family with the approval of the hospital ethics committee. It is not intended by this opinion that a court order is required in such situations." *Id.* at 341 n. 4.

We conclude that the supreme court's reasoning in *Torres,* which permits the district court to authorize a guardian to disconnect a ward's life-support systems, also permits a guardian to make such a decision under the medical-consent power, based on the guardian's position as surrogate to assert the ward's right to refuse treatment. *See id.* at 339–40; *see also Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 278, 280, 110 S.Ct. 2841, 2851–52, 111 L.Ed.2d 224 (1990) (holding that an

4. Here, the district court did not analyze any of the state interests enumerated in *Torres* to determine whether they would be implicated by the guardian's decision to disconnect life support without a court order.

incompetent person retains a constitutionally protected right to refuse medical treatment, which may be exercised by a surrogate). Therefore, the district court erred by concluding that *Torres* precludes a guardian who has medical-consent powers from authorizing disconnection of a ward's life-support systems without district-court permission even if no interested person has objected.

*Authority from other jurisdictions*

Our holding in this case is also consistent with the majority view expressed by appellate courts in other jurisdictions. *See, e.g., Rasmussen by Mitchell v. Fleming*, 154 Ariz. 207, 741 P.2d 674, 688 (1987) (citing *Torres* and concluding that a guardian's right to consent to approve delivery of care in guardianship statute "must necessarily include the right to consent to or approve the delivery of *no* medical care"); *Woods v. Commonwealth*, 142 S.W.3d 24, 50 (Ky.2004) (concluding that, absent disagreement by physicians, family, or an ethics committee, a judicially appointed guardian may make a decision withdrawing life-prolonging treatment of a ward without court approval); *In re Jobes*, 108 N.J. 394, 529 A.2d 434, 447, n. 12 (1987) (stating that, if a court considers whether the proposed guardian would be an appropriate person to make future medical decisions for the ward, "no further judicial intervention [is] necessary"); *In re Guardianship of Hamlin*, 102 Wash.2d 810, 689 P.2d 1372, 1375–76, 1378 (1984) (holding that, when the guardian, prognosis committee, and treating physicians agreed with diagnosis of persistent vegetative state and that termination of life support was in ward's best interest, guardian had the authority to terminate life-support systems without judicial involvement); *L.W.*, 482 N.W.2d at 75 (holding that court approval of a guardian's decision to withdraw life-sustaining medical treatment, absent an objection by an interested party, "is not

required," but noting that "[c]ourt review . . . remains appropriate and available where any interested party objects to the decision of the guardian"). According to one commentary:

> Much of the controversy that punctuated the earliest end-of-life cases has faded as the courts have reached a consensus that routine judicial review is not required, and that review should occur, if at all, in the clinical setting. The courts are available to review decisions about life-sustaining treatment if any of the parties to the decisionmaking process wish.

Alan Meisel & Kathy L. Cerminara, *The Right to Die*, § 3.18[E], at 3–74 (3d ed. Supp. 2010).

*Due-process and public-policy implications*

The district court concluded that the judicial process inherent in a separate proceeding to authorize a guardian to disconnect life-support systems would assure the ward's due-process rights. *See Campbell v. St. Mary's Hosp.*, 312 Minn. 379, 384–85, 252 N.W.2d 581, 585 (1977) (stating that actions taken under color of state law that deprive a person of a protected interest violate due process). The district court stated that termination of life support was not a power that could reasonably be considered or conveyed at the time of an initial guardianship appointment; that most guardians received no training dealing with end-of-life issues; and that, because a minority of guardians may act irresponsibly, the court is in the best position to make impartial and experienced evaluations of termination decisions.

Amicus State of Minnesota argues that public policy requires additional due process for a decision to discontinue the life-

support systems of a ward of the state.[5] But the supreme court has rejected a similar argument with respect to state wards, holding that a public conservator who had been granted the power to consent to necessary medical care on behalf of a developmentally disabled conservatee did not need further court approval to consent to the conservatee's treatment with neuroleptic medication. *Foster*, 547 N.W.2d at 87. The supreme court noted the presence of state administrative rules imposing standards on such treatment and concluded that "additional procedural standards imposed by the [district] court provide little additional value and are largely duplicative of a comprehensive statutory and administrative system that fairly, efficiently, and effectively safeguards the rights of the conservatee." *Id.* at 89.

Similarly, the administrative rules of the Department of Human Services provide that, although county staff acting as public guardians lack authority to grant consent for do-not-resuscitate orders for developmentally disabled conservatees, the department retains authority to provide consent for those orders. Minn. R. 9525.3055, subps. 1, 2 (2011). The rules prescribe procedures for obtaining such an order, including reasonable efforts to obtain agreement from the ward and the nearest relative, a physician's written recommendation, a statement that death is imminent or that initiating CPR would be medically futile or would harm the ward, and, if requested, a biomedical ethics report. *Id.*, subp. 2. The promulgation of similar rules relating to the disconnection of life-support systems would provide safeguards for a public guardian's decisionmaking on behalf of an incompetent state ward.

■ Moreover, the supreme court has observed that "[g]uardianship statutes are designed to provide flexibility and adaptability in caring for the ward according to his changing needs." *Grier v. Estate of Grier*, 252 Minn. 143, 148, 89 N.W.2d 398, 403 (1958). "[A guardian's] statutory authority is not to be construed . . . as placing [the guardian] in a legal straitjacket which deprives [the guardian] of all discretion and flexibility in meeting the needs of the ward." *Id.* at 148, 89 N.W.2d at 402–03. A guardian's decisions must be made in the ward's best interests. *In re Conservatorship of Brady*, 607 N.W.2d 781, 784 (Minn.2000) (citing *Torres*, 357 N.W.2d at 337–38). The *Torres* court recognized that often continued, long-term treatment will not be in a patient's best interests because a high chance of severe permanent disability exists even if a patient were to return to consciousness, and because such treatment frequently imposes severe emotional and financial burdens on a patient's family. *Torres*, 357 N.W.2d at 338–39 (quotation omitted). Although courts are experienced in making reasoned and impartial decisions, doctors and medical-ethics committees have the most appropriate knowledge and expertise to evaluate the potential for a ward's long-term recovery and quality of life and advising a guardian on end-of-life decisionmaking. Imposing a requirement for additional court involvement in this process would be inconsistent with the supreme court's recognition of a private, medically based model of decisionmaking. *See id.*, 357 N.W.2d at 341 n. 4. In the unfortunate situation when medical professionals have concluded that a ward is extremely unlikely to regain consciousness, and when no interested persons have objected, we see no benefit to requiring district-court review of a guardian's decision to authorize the disconnection of a ward's life-support systems.

---

**5.** Although Tschumy was not a ward of the state, we address this argument based on its public-policy implications for public guardians and wards.

*Standards and limitations*

■ In making a determination on whether the ward's best interests weigh in favor of disconnecting life support, a guardian must consider a ward's expressed moral or religious beliefs and wishes, if they exist. *See* Minn.Stat. § 524.5–313(c)(4)(i) (providing that a "guardian shall not consent to any medical care for the ward which violates the known conscientious, religious, or moral beliefs of the ward"); *see also Torres,* 357 N.W.2d at 339 (stating that "[a]t a minimum, any determination of a conservatee's 'best interests' must involve some consideration of the conservatee's wishes"). If those wishes have not been expressed, as in this case, the guardian should consult with family, medical professionals, and a medical-ethics committee to arrive at a thoughtful resolution, recognizing that, at times, this may culminate in the difficult decision to disconnect a ward's life-support systems.

Finally, we note that our holding does not preclude a district court, in appointing a guardian, from expressly excluding authority to direct the disconnection of a ward's life-support systems from the guardianship powers granted. *See* Minn. Stat. § 524.5–313(c) (providing that "[t]he duties and powers ... which the [district] court may grant to a guardian include, but are not limited to [specified statutory powers]"). Nor does our holding preclude an interested person from seeking district-court review of a guardian's decision to direct the disconnection of life-support systems by petitioning the district court to remove a guardian or alleging that the disconnection of life-support systems would not serve a ward's best interests. *See* Minn.Stat. § 524.5–112(b) (2012) (providing that the ward or an interested person may petition to remove a guardian on the basis that removal would be in the ward's best interests "or for other good cause"); Minn.Stat. § 524.5–102, subd. 7 (2012) (defining interested person); Minn. Stat. § 524.5–317 (permitting the court, on petition of a person interested in the ward's welfare, to terminate a guardianship or modify a guardian's powers or to "make any other order that is in the best interest of the ward"); Minn.Stat. § 252A.19, subd. 2 (2012) (providing similar process with respect to public guardianships). We merely conclude that in end-of-life cases when: (a) the guardian has been granted the medical-consent power; and (b) no interested party has challenged the guardian's decision, made in consultation with available family, physicians, and an ethics committee, it is in the ward's best interest to disconnect life-support systems, additional district-court review is not required.

## DECISION

The district court erred by concluding that a guardian who has previously been granted the medical-consent power under Minn.Stat. § 524.5–313(c)(4)(i) must seek separate authorization from the district court to discontinue life-support systems from a ward who is in a permanently unconscious state. Because we conclude that the medical-consent power granted to a guardian under that subdivision encompasses the power to discontinue life-support systems in those circumstances, a guardian who has been granted that power has authority, absent objection by an interested person and with advice from available family members, physicians, and an ethics committee, to direct the disconnection of life-support systems without further authorization from the district court.

**Reversed.**